353 F.2d 963
 Ike DOVBERG and Maurice Dovberg, Individually and Trading as Paste Company of America, Appellants,
v.
DOW CHEMICAL COMPANY, Pennsylvania Paste Company, Samuel Schultz, Ada Schultz, Marvin L. Spiro and Isadore Kaplan, Individually and Trading as Samuel Schultz & Co., a Partnership, and Reba Spivak, Individually and Trading as Atlas Wallpaper & Paint Co.
 No. 14302.
 United States Court of Appeals Third Circuit.
 Argued September 26, 1963.
 Reargued October 7, 1965.
 Decided December 3, 1965.
 
 Tom P. Monteverde, Philadelphia, Pa., (Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel, on the brief), for appellants.
 Herman J. Obert, Philadelphia, Pa., (Cushman & Obert, Philadelphia, Pa., on the brief), for Pennsylvania Paste Co.
 Philip Price, Philadelphia, Pa. (William L. Matz, Philadelphia, Pa., Zoob, Cohan & Matz Dechert, Price & Rhoads, Philadelphia, Pa., of counsel, on the brief), for Samuel Schultz & Co.
 Before KALODNER, Chief Judge, and BIGGS, McLAUGHLIN, STALEY, HASTIE, GANEY, SMITH and FREEDMAN, Circuit Judges.
 GANEY, Circuit Judge.
 
 
 1
 This is an action under the antitrust laws, §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2,[1] and of the Clayton Act, as amended, 15 U.S.C. §§ 13 to 15 inclusive.[2] Originally, the plaintiffs named nineteen defendants in the action, either individually or by their firm names. Through interrogatories and depositions, by way of discovery, and agreements to dismiss, the case went to trial on November 29, 1961, with only the Dow Chemical Company, Pennsylvania Paste Company, Samuel Schultz, Ada Schultz, Marvin Spiro and Isadore Kaplan, individually, and trading as Samuel Schultz & Co., Reba Spivak, individually, and trading as Atlas Wallpaper & Paint Co., and Samuel Milkas, individually, and trading as Empire Wallpaper & Paint Co. remaining as defendants.
 
 
 2
 As adverted to above, after bringing into the sweep of the alleged conspiracy nineteen defendants, only two, the Pennsylvania Paste Co. and Schultz, whom the jury found guilty of the conspiracy count, are left, who are the appellants here. A verdict was rendered in favor of two of the defendants, the Dow Chemical Co. and Reba Spivak, individually, and trading as Atlas Wallpaper & Paint Co., but, as indicated above, the defendants, Pennsylvania Paste Co. and Schultz were found guilty of violation of § 1 of the Sherman Act. All the defendants were acquitted of charges contained in § 2 of the Act after the court below had refused a motion for summary judgment and, at the close of the plaintiff's case, denied motions for judgment as to all the defendants, except Samuel Milkas, individually, and trading as Empire Wallpaper & Paint Co., against whom no evidence had been offered, and, at the conclusion of all the evidence, the defendants submitted motions for a directed verdict which were likewise refused by the court. Accordingly, after trial and judgment, the court below vacated the judgment and granted judgment n. o. v., in accordance with Rule 50(b) of the Rules of Federal Procedure. Thus, this appeal concerns itself only with the defendants, Pennsylvania Paste Co. and Schultz.
 
 
 3
 It is requisite, in order to determine whether the defendant, Schultz, was a party to an alleged conspiracy with the Pennsylvania Paste Co. to preserve the dominance of the Pennsylvania Paste Co. in the wet paste industry in this area, by driving the plaintiff out of business, to critically examine a long, tedious and dreary record of nearly 6,000 pages and over 500 exhibits. In order to place in precise focus the factual matters on which the alleged offense is predicated, it is necessary to place in some chronological order the dates and the exact testimony of the witnesses involved, rather than resort to any generalization.
 
 
 4
 This case was one of the longest ever tried in the history of the Eastern District of Pennsylvania, and the court below, knowing the intricacy thereof and the complexity of the evidence to be submitted, finally, after many weeks of discovery through depositions and interrogatories, directed the plaintiff, in order to bring the matter into proper focus, to file a pretrial statement of the contentions he was going to present at the trial in order to clarify the precise issue posed by the plaintiff, as well as to apprise the defendants of the nature of the cause of action he was suing on. After several requests for extensions, the plaintiff, on December 30, 1959, filed a 17 page pretrial statement in which he set forth, in great detail, his contentions, and in so doing gave the history of the case from 1949 on down to the filing of the second amended statement of claim, on December 31, 1959. (It is to be noted that while the second amended statement of claim was filed one day after the pretrial statement of December 30, 1959, the amended statement of claim was in the hands of all of the counsel for defendants on November 17, 1959, and it was never amended or changed in the slightest.) The pretrial statement or statement of contentions of the plaintiff, as he labeled it under the heading, "b. The Legal Basis for the Claim Against Pa. Paste", on page 5 thereof, states: "Plaintiffs' basic contention of law is that the Pennsylvania Paste Co. conspired with the other defendants to destroy the plaintiffs' business and thereby preserve Pennsylvania Paste's dominant position in the wet paste manufacturing business in the Philadelphia area." This contention was referred to time and time again in the plaintiff's argument and in his brief as being the real core of the conspiracy; that it was the intention of the defendant, Pennsylvania Paste Co., in order to maintain its supremacy in the wet paste industry in the Philadelphia area, to drive the plaintiff out of business. In the pretrial statement, The Legal Basis for the Claim Against Pa. Paste covers nearly 4 pages, the contentions as to the Dow Chemical Co. cover 3 pages and the contention therein stated as to the retailers covers approximately 1 page, ½ of which is devoted to the retailers generally, all of whom were acquitted or dismissed by the court, and less than ½ page to the basis for the plaintiff's claim against the defendant, Schultz. Both charges against Schultz are short and, therefore, we quote the exact language, taking the second charge first, which is as follows: "Plaintiffs also contend that, pursuant to the conspiracy alleged, the defendant, Samuel Schultz, induced United Wallpaper Co. to imitate and sell an imitation of plaintiffs' cellulose paste and, that after plaintiffs' product had been patented, he also discouraged a potential purchaser of the plaintiff's business from following through on the purchase by telling the prospective purchaser that anyone could manufacture the plaintiffs' products." (Italics ours.)
 
 
 5
 The above occurred in the fall of 1951, and concerned itself with a product manufactured by Dovberg called "Calico", a cellulose base wallpaper paste, a package of which was brought to the Schultz store at 2104 North Front Street, Philadelphia, and given to him as a sample, and Schultz replied that if, when he tested the same, it worked out as Dovberg said it would, he would be glad to take it to the United Wallpaper Co., a large concern, and see if he could get them interested on Dovberg's behalf. He further told Dovberg he would tell him what they thought of the product and if they liked it, they would not only manufacture it, but they would also license rights for it. Schultz promised to let him know about it and Dovberg said he was "very grateful and very much elated." However, Dovberg never again discussed this matter with either Schultz or any representative of his and the matter was dropped and there is nothing in the record to show whether the United Wallpaper Co. thought anything of the product or that they manufactured it. Therefore, it is obvious from the record that there is no warrant for this allegation against Schultz and it must be discarded.
 
 
 6
 The remaining and sole contention which must be relied upon by the plaintiffs is the second and last one wherein the pretrial statement reads as follows: "Plaintiffs also contend that, at the instigation of the Pennsylvania Paste Co. and pursuant to the conspiracy alleged, the retail defendants sold the wall-size eliminator which they purchased from the Pennsylvania Paste Co. as being the same thing as Nix-size. Apart from its connection with a conspiracy to restrain trade, such an activity would be improper under the principles in the Restatement Torts §§ 711 and 712(l), 741(b) and 743." (Italics ours.)
 
 
 7
 The statement of claim filed September 25, 1958, makes it requisite, in the face of the four-year statute of limitations, that the actionable cause of the conspiracy concerns itself with the conduct of Schultz and the Pennsylvania Paste Company from September 25, 1954, to September 25, 1958.
 
 
 8
 The theory of the plaintiff is that the conspiracy had its origin in the conduct of the parties previous to 1954, and, more particularly, that there was a conspiracy to drive the plaintiff, Dovberg, out of business in order for the Pennsylvania Paste Company to maintain its dominant position in the wet paste industry which allegedly originated previous to 1954, and as hereafter adverted to.
 
 
 9
 Briefly, the facts, as regard Schultz's alleged participation in a conspiracy with the Pennsylvania Paste Company, concern a relatively small part of the record and we shall relate them. The Pennsylvania Paste Company held a dominant position in the manufacture of wet paste and had been so doing since 1892, and it controlled more than 50% of the wet paste marketed in the Philadelphia area and, although it made dry paste, the manufacture of wet paste was much more profitable and it, accordingly, concentrated on it. The plaintiff, as early as 1949, was manufacturing a wall-size eliminator called Nix-size and in February, 1950, opened a small plant for the making of Nix-size and wet paste. The plaintiff marketed its wet paste in wooden tubs and sold the same in the Philadelphia area to its customers, some of whom formerly had been with the Pennsylvania Paste Company. The record discloses that many of these tubs were appropriated by the Pennsylvania Paste Company drivers and later, when the plaintiff changed its wet paste product to be marketed in fiber drums, these drums likewise mysteriously disappeared and, although the Pennsylvania Paste Company denied any participation therein, the plaintiff found, upon visiting the plant of the Pennsylvania Paste Company, that some of these containers were in their plant. Nevertheless, the record is devoid of any connection of Schultz with this conduct and, in fact, his name was never mentioned in connection therewith as up to this time he had not begun to purchase wet paste from the plaintiff, Dovberg. However, Schultz, who had been doing business with the plaintiff as related since 1949 in other products such as Nix-size, began buying wet paste from the plaintiff on August 25, 1950, and continued up to October 28, 1950, when he discontinued buying from Dovberg, as he had purchased during this period the trivial amount of $32, although he maintained business with Dovberg buying his related products until March of 1952, when he discontinued purchasing Nix-size from him, which, as shall be adverted to later, has nothing whatsoever to do with the plaintiff's going out of the wet paste business. The testimony plainly shows that, although the plaintiff first testified he went out of the wet paste business in October, 1950, on later examination, he stated finally that he went out of the wet paste business in January, 1951, and he further testified that he so did because the Pennsylvania Paste Company was successful in driving him out of it and, in so stating, he never accused Schultz of any complicity whatever in his abandoning the wet paste business. He further testified that he never made wet paste thereafter, except on rare occasions and for a few special customers and, accordingly, he was, in no sense, in the wet paste business as to be competitive of the Pennsylvania Paste Company thereafter. As of January 1, 1951, it is apparent that the "conspiracy alleged" of both the Pennsylvania Paste Company and Schultz, in driving the plaintiff out of the wet paste business in order that the Pennsylvania Paste Company might maintain its dominance in the wet paste industry, died aborning, as Schultz was, on the record, in no wise connected therewith. While the record discloses that in a telephone conversation between the plaintiff, Dovberg, and Flanagan of the Pennsylvania Paste Company, on September 12, 1950, Flanagan told the plaintiff, Dovberg, that he understood he was making wet paste and that he would "drop dead" before he would lose one customer to him and that he was going to drive him out of business, that, here again, there is nothing in the record showing any connection whatsoever of Schultz with this statement of Flanagan or any conduct on the part of Schultz which could be construed as anything agreeing with the statement Flanagan made, as Schultz's name was not even mentioned in connection therewith. It is to be remembered that at the time this statement was allegedly made by Flanagan, Schultz had already stopped buying wet paste from the plaintiff, Dovberg, even though it was in exceedingly small amounts totaling, as adverted to before, some $32. On another occasion, late in 1951, Dovberg testified that Schultz called him and testified that Flanagan was "gunning mad" at him for purchasing his wet paste and Schultz advised him not to make wet paste for if he continued to make and sell it Flanagan was the type of fellow who could put him out of business. It is to be remembered that this is flatly contradictory of Dovberg's previous statement that the Pennsylvania Paste Company had successfully driven him out of business on January 1, 1951, as well as the fact that Schultz had stopped purchasing wet paste from Dovberg on October 28, 1950. This is the only testimony that, in any wise, connects Schultz with any knowledge of any relationship between the plaintiff, Dovberg, and the Pennsylvania Paste Company. However, it is also to be remembered that at the time of this conversation Schultz and Dovberg were on the most friendly terms and Schultz continued to do business with Dovberg for more than a year and a half thereafter. The record further discloses that Schultz stopped purchasing Dovberg's products on March 14, 1952, and the day before Schultz called Dovberg on the phone and told him the reason therefor that Flanagan of the Pennsylvania Paste Company was in to see him and left a sample of a product just like Nix-size and advised him, Schultz, that it had the same effect as Nix-size and that he would manufacture it for him under Schultz private label, since Schultz, a very large retailer, sold most of his products under his own label. He further advised plaintiff Dovberg, that he had a contract from the Pennsylvania Paste Company on his desk to buy the product and that he could sell it for much less than he could get Nix-size from Dovberg and by reason of these circumstances, when he had sold out his present inventory which he had purchased from him, Dovberg, he was not going to buy any more from him. Dovberg's reply to Schultz in this conversation was that he could not conceive of Flanagan selling a product similar to his at a lesser price unless he was putting into effect a threat he had made to him, Dovberg, to put him out of business and "if they did anything in joining an effort combined to hurt our business" that he would have to hold Schultz responsible therefor. (Italics ours.) However, on the very same day he wrote a letter to Schultz wherein he referred to this conversation, but made no mention whatsoever of a threat that had been made to him nor anything whatsoever about a joint effort to put him out of business. Furthermore, he closed the letter referring to their very good friendship and the friendly company that was Schultz, whom he "yearns to do business with" and with the hope that they would be able to serve him in the future. The only conclusion that could be drawn from the letter was one of a warm spirit of friendship and the regret that he was no longer to do business with him, Dovberg. If we draw the most favorable inference possible from the conversation and letter, it certainly does not comprise a conspiracy between defendant, Schultz, and defendant, Pennsylvania Paste Company, through Flanagan, concerning the wet paste business. For here again, it is to be remembered that this conversation in which defendant, Schultz, advised the plaintiff, Dovberg, that he was no longer going to buy Nix-size because it produced the same results as Nix-size did and because it was cheaper, was more than a year and a half after Schultz stopped purchasing wet paste from the plaintiff, Dovberg, and more than a year after Dovberg had gone out of the wet paste business for which he personally accused only the Pennsylvania Paste Company.
 
 
 10
 During the years 1954 to 1958, which constitute the actionable claim for conspiracy, the record is devoid of any conversations between the Pennsylvania Paste Company and the defendant, Schultz, concerning the plaintiff, Dovberg, from which anything like a conspiracy could be inferred and there was nothing in the conduct of the defendant, Schultz, other than his purchasing Magicoat, similar in style and effect to Nix-size, but at a lesser price, wich was manufactured by the Pennsylvania Paste Company for Schultz under his private label, Magi-coat, and Schultz's failure to make any further purchases of anything whatsoever from Dovberg thereafter.
 
 
 11
 It is likewise significant that through hundreds of pages of testimony covering some nineteen witnesses over many days of trial, they concerned themselves solely with various customers complaining to plaintiff, Dovberg, that the Pennsylvania Paste Company was selling Liqui-size, which it manufactured at a cheaper price than Nix-size and, in some instances, Flanagan again threatened to drive Dovberg out of business, but in this long record of testimony there is not a single instance in which any of these customers ever even hinted at Schultz's being involved with the Pennsylvania Paste Company in any conspiracy, nor, in fact, even mentioned Schultz's name in connection therewith.
 
 
 12
 It may well be that, on a better record, though questionably, a case of unfair competition might be made out against the Pennsylvania Paste Company for palming off their products, Liqui-size and Magi-coat, allegedly in imitation of the plaintiff's product, Nix-size. However, nothing in the testimony, it is submitted, gives rise to an actionable case of conspiracy against the plaintiff between the Pennsylvania Paste Company and Schultz.
 
 
 13
 A critical examination of this record shows, neither directly nor by circumstantial evidence, any conspiratorial conduct on the part of Schultz with the Pennsylvania Paste Company, to drive the plaintiff, Dovberg, out of business, in order to preserve the Pennsylvania Paste Company's dominant position in the wet paste industry. We reach this conclusion, using as the guide on appeal, that this court must consider the evidence in its strongest light in favor of the party against whom the motion is made and the appellant here, and giving him the advantage of every fair and reasonable intendment that the evidence can justify. Delaware Valley Marine Supply Co. v. American Tobacco Co., (3rd Cir.), 297 F.2d 199, cert. denied 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843; Hornin v. Montgomery Ward & Co., (3rd Cir.), 120 F.2d 500; Viking Theatre Corp. v. Paramount Film Distributing Corp. (3rd Cir.), 320 F.2d 285, aff'd 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743; Pearl Assurance Co. v. Stacey Bros. Gas Construction Co., 6 Cir., 114 F.2d 702; Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777; Moore's Federal Practice, 2nd Ed., Vol. 5, p. 2316.
 
 
 14
 Accordingly, the order of the court below in granting judgment n. o. v. is affirmed.
 
 
 
 Notes:
 
 
 [1]
 §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, provide, in part:
 "Every * * * combination * * * or conspiracy, in restraint of trade or commerce among the several States * * * is declared to be illegal: * * *."
 "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States * * * shall be guilty of a misdemeanor * * *."
 
 
 [2]
 § 4 of the Clayton Act, 15 U.S.C. § 15, provides:
 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States * * * without respect to the amount in controversy * * *."
 
 
 KALODNER, Chief Judge (dissenting):
 
 15
 I dissent from the majority's conclusion that the evidence was insufficient to support the jury's verdict, and its affirmance of the District Court's Order granting the defendants' motions setting aside the jury's verdict in favor of the plaintiffs.
 
 
 16
 In my opinion, the evidence, viewed in the light most favorable to the plaintiffs, as it must be,[1] reasonably permitted the jury's finding that the defendant Pennsylvania Paste Company ("Pennsylvania") acted to destroy the plaintiff's business, and the defendant Samuel Schultz & Co. ("Schultz") was aware of its purpose and design, and that it acted in concert with Pennsylvania to accomplish it.
 
 
 17
 This is an action under Sections 1 and 2 of the Sherman Act,[2] and Sections 2, 3 and 4 of the Clayton Act[3] as amended by the Robinson-Patman Act. The plaintiffs, Ike and Maurice Dovberg, trading as Paste Company of America, were, until 1957, manufacturers of dry and cellulose based wallpaper paste and wall size eliminator. Pennsylvania manufactures wallpaper paste and related products, and Schultz, among other things, retails paste products. The named parties were engaged in business in the City of Philadelphia, Pennsylvania, at the times relevant here. The plaintiffs' basic contention in their action is that Pennsylvania and Schultz conspired to destroy their business and thereby preserve Pennsylvania's dominant position in the wet paste manufacturing business in the Philadelphia area.
 
 
 18
 The case is now here because the trial court following its pre-trial denial of the defendants' motions for summary judgment, 195 F.Supp. 337 (E.D.Pa.1961), and its subsequent denial at the conclusion of the plaintiffs' testimony, of the defendants' motions for directed verdicts and dismissal,[4] then granted the defendants' motions for judgment n. o. v.,[5] or in the alternative for a new trial, following a jury's verdict of $22,000 in favor of the plaintiffs, and against both defendants, which verdict had been trebled by the trial court pursuant to the statute.
 
 
 19
 The trial court premised its Order and Direction for Judgment n. o. v.[6] on its determination (1) that "no evidence has been adduced indicating any plausible or rational motive for Samuel Schultz & Co. to have entered into a conspiracy * * * to force plaintiffs out of business"; (2) "no other probative evidence has been introduced linking Samuel Schultz & Co. conspiratorily with Pennsylvania Paste"; (3) "Pennsylvania Paste is legally unable to conspire with itself and therefore violate § 1 of the Sherman Act (15 U.S.C. § 1)"; and (4) "There has thus been total failure and lack of evidence to prove the essential elements of plaintiffs' case relating to guilt of Samuel Schultz & Co." It premised its alternative granting of the defendants' motion for a new trial on its determination "that such substantial portions of the testimony of plaintiff Maurice Dovberg (on the stand over 6 weeks and over 4200 transcript pages) ranged from deliberative obfuscation to deliberate fabrication, and from fantasy to the bizarre, and that said testimony, on the whole, cannot be granted much credence, the Court thus concludes that the jury verdict is against the weight of the credible evidence."
 
 
 20
 On this appeal the plaintiffs urge that the trial judge erred in granting the defendants' motions for judgment n. o. v. or in the alternative for a new trial.
 
 
 21
 This dissent concerns only the judgment n. o. v. issue in view of the majority's disposition.
 
 
 22
 In essence, the critical question it presents is whether the trial judge was right when he first denied the defendants' motions for a directed verdict at the conclusion of the plaintiffs' case on the ground that sufficient evidence had been presented by the plaintiffs to support their action if the jury credited it, or whether he was right when he found in granting judgment n. o. v. that the evidence was insufficient.
 
 
 23
 The trial judge exhaustively reviewed the plaintiffs' evidence in the 75-page Opinion in which he denied the defendants' motions for a directed verdict at the conclusion of the plaintiffs' case.
 
 
 24
 In that Opinion he said with respect to the plaintiffs' testimony in support of their allegation that "Pennsylvania Paste conspired with the other defendants to destroy plaintiffs' business * * * and thereby preserve Pennsylvania Paste's dominant position in the wet paste manufacturing business in the Philadelphia area. * * *"
 
 
 25
 "While the great bulk of it [plaintiffs' testimony] was hearsay, there does appear to be a modicum of direct testimony admitted to raise a substantial issue of fact as to the truth of the allegation. * * * Pennsylvania Paste's motion is denied. A sufficient quantum of evidence has been adduced by plaintiffs to allow the case against this defendant to go to the jury. Evidence has been adduced, for example, as to alleged statements of Mr. Flanagan, of Pennsylvania Paste's intent to force plaintiffs out of business; of Pennsylvania Paste placing on the market Liqui-Size with the intent to force plaintiffs out of business; of Pennsylvania Paste's costs being the same or higher than those of plaintiffs; of Pennsylvania Paste selling its product for prices below cost; of Pennsylvania Paste taking butter tubs belonging to plaintiffs. In short, sufficient factual questions have been presented by plaintiffs to allow the jury to rule on the issues." (emphasis supplied)
 
 
 26
 Again, with respect to the plaintiffs' allegations charging Schultz with conspiring with Pennsylvania "to drive plaintiffs out of business" the trial court said:
 
 
 27
 "Substantial evidence has been introduced to this effect. * * * Schultz's motion is denied. Evidence has been adduced that Schultz knew of Pennsylvania Paste's illegal aim; that Schultz acted in furtherance of it by selling the wall size eliminator purchased from Pennsylvania Paste as being, or being the same thing as Nix-Size. Of itself, such evidence is legally sufficient to allow the jury to rule on the allegations." (emphasis supplied)
 
 
 28
 These well-settled principles must be applied in deciding whether the trial judge erred in granting the judgments n. o. v. under review, pursuant to Rule 50 (b) of the Federal Rules of Civil Procedure:[7]
 
 
 29
 It is settled that Rule 50(b) has not withdrawn from juries their exclusive power to weigh evidence and determine contested issues of fact since a jury is "the constitutional tribunal provided for trying facts in courts of law."[8] The Rule presents only the question of law, as to whether, when all the evidence is considered, together with all reasonable inferences which may be drawn therefrom most favorable to the plaintiff, there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case;[9] otherwise stated, the question is whether the evidence is sufficient to sustain the verdict. Where reasonably fair-minded men may differ as to the conclusions of fact to be drawn from the evidence, a jury is the proper tribunal to decide the issue.[10]
 
 
 30
 It may be noted parenthetically that the issues were here submitted to the jury in a 39-page charge. That it was discriminating in its consideration of the testimony, is evidenced by the fact that after it had deliberated for over 24 hours before reaching its findings, it found in favor of the plaintiffs against the defendants Pennsylvania and Schultz only on the conspiracy count[11] of the charged Sherman Act violation, and in favor of Pennsylvania and Schultz on the monopoly count;[12] further, the jury found against the plaintiffs in favor of the defendant Dow Chemical Company, supplier of the principal ingredients of one of the plaintiffs' major products, and the defendant Atlas Wallpaper & Paint Company, a retailer.
 
 
 31
 It may further be stated that counsel had spent five days in summing up. The trial here was the longest in the history of the Eastern District of Pennsylvania. It began on November 28, 1961 and was concluded on March 29, 1962. The plaintiffs' principal witness, Maurice Dovberg, was examined on 35 days; his testimony alone covered more than 4300 pages. Eighteen other witnesses also testified for the plaintiffs over a period of five days; their testimony covered 700 pages. Some 426 exhibits were offered and admitted in the plaintiffs' case. The defendants' case took over 20 trial days, covering 1700 pages of testimony; their exhibits numbered 277.
 
 
 32
 Stated in broad outline, the plaintiffs sought at the trial to establish that from 1950 through 1957 they manufactured and sold an additive for wallpaper paste and related products throughout the eastern part of the United States; that during that period Pennsylvania acted to destroy their business in order to preserve Pennsylvania's dominant position as a wet wallpaper paste manufacturer in the Philadelphia area, by manufacturing and selling below cost a wall size eliminator whose form, composition and packaging were a conscious imitation of the plaintiffs' wall size eliminator — "Nix-Size";[13] that Schultz, the largest wallpaper and paint distributor in the Philadelphia area, who was the plaintiff's largest customer, conspired with Pennsylvania to destroy the plaintiffs' business by cutting off its purchase of the plaintiffs' product and purchasing Pennsylvania's imitation instead and marketing it as the plaintiffs' product or as identical to the plaintiffs' product.
 
 
 33
 The plaintiffs' testimony adduced at the trial on the issue of conspiracy to violate the anti-trust laws, insofar as Pennsylvania is concerned, was as follows:
 
 
 34
 Pennsylvania has been a manufacturer of wet and dry wallpaper paste since 1892. During 1950 through 1957 approximately 45% of its total business was in wet wallpaper paste; it controlled 50% of the wet paste market in Philadelphia. Its sales of wet paste were more profitable than the sale of its other principal product, dry paste, since the former enjoyed a higher mark-up — 90%. Its sales of wet paste declined steadily throughout 1950 to 1957.
 
 
 35
 In 1949, the plaintiffs applied for a patent and began to sell its wall size eliminator "Nix-Size". In February of 1950 they purchased a factory in Philadelphia for the manufacture of "Nix-Size" and wet paste. In the spring of 1950, D. J. Flanagan, president of Pennsylvania, visited plaintiffs' factory and learned of the use to which it was to be put. He obtained a sample of "Nix-Size", took it to a firm of consulting chemists and received from them a formula for a competitive product. Plaintiffs first marketed their wet paste in returnable wooden butter tubs which cost them 95 cents each. They charged a 35 cent deposit per tub to purchasers of the wet paste. They began to sell the wet paste to many of Pennsylvania's customers, and when they attempted to retrieve the tubs they rarely were successful. On September 12, 1950, one of plaintiffs telephoned Flanagan complaining that retailers had reported that Pennsylvania's drivers were picking up the tubs and requested that they be stopped. Flanagan denied such activity. In September, 1950, plaintiffs bought fibre drums at a dollar each to market their wet paste. Although they were marked as their property they, too, were not returned. Again, Flanagan denied knowledge of their disappearance. In the spring of 1951 one of the plaintiffs visited Pennsylvania's plant and found some of their wooden tubs and fibre drums there. Meanwhile, in December, 1950, Pennsylvania too marketed its wet paste in fibre drums similar to those of the plaintiffs. Although these drums held one and one-half quarts more paste than the wooden tubs, Pennsylvania didn't raise its price; the plaintiffs had to meet it and sell at a loss. By 1951, the plaintiffs were forced to stop large scale marketing of wet paste because of their losses, due to inability to raise prices and lost drums. When they did so Pennsylvania raised its prices. Plaintiffs, however, continued to market small quantities of wet paste and to advertise.
 
 
 36
 Plaintiffs' principal product was "Nix-Size", the wall size eliminator. At the time that it was first manufactured in quantity, there were no competitors. However, plaintiffs became aware of rumors to the effect that Flanagan had had "Nix-Size" analyzed and that he was planning to market a similar product. In the earlier mentioned conversation of September 12th, one of the plaintiffs mentioned this to Flanagan. Flanagan replied that he understood that the plaintiffs were manufacturing wet paste in competition with Pennsylvania and said that "if I lose one customer, I would sooner drop dead on the street;" and furthermore, so long as the plaintiffs continued to manufacture wet paste Pennsylvania would imitate any product they manufactured and could afford to out produce and undersell them even to the point of suffering losses, until they were put out of business. In October, 1950, Pennsylvania marketed a competing product, "Liqui-Size". "Liqui-Size" had the same appearance as "Nix-Size"; was packaged in the same quantities; contained essentially the same ingredients; was merchandised as being identical to "Nix-Size" and contained the same directions for use as "Nix-Size". In the spring of 1952, "Liqui-Size" was packaged in a bottle identical to that used for "Nix-Size". Although "Liqui-Size" was sold as essentially identical to "Nix-Size", a paperhanger, Mrs. Rosner, testified that she had used both products and that "Liqui-Size" had proved unsatisfactory, relative to "Nix-Size", primarily because it took twice as much "Liqui-Size" to do the exact same job as "Nix-Size". Later, Dr. Obold, Chairman of the Department of Biochemistry at Drexel Institute of Technology, testified that it was his belief that if "Liqui-Size" performed as Mrs. Rosner had related, then this was an indication that it probably contained more water that "Nix-Size", and therefore would be possessed of less adhesive quality.
 
 
 37
 On December 20, 1950 plaintiffs sent a registered letter, with return receipt to Flanagan, in which they accused Flanagan of perpetrating "diabolical acts calculated to drive them out of business, and requested that he please refrain from further applying these "ruthless tactics." Flanagan made no response to this letter. After the appearance of "Liqui-Size" on the market, "Nix-Size" sales fell off. Plaintiffs spoke with several of their customers and found that Flanagan had continued to merchandise "Liqui-Size" as identical to "Nix-Size" but less expensive, and given favors and free merchandise to retailers. Prior to Pennsylvania's marketing of "Liqui-Size" plaintiffs had profitably sold their "Nix-Size" for $4.20 a dozen and $48.00 per gross. "Liqui-Size" entered the market at $3.75 per dozen and on March 19, 1951 the price was reduced to $3.50 per dozen and $3.20 on gross purchases. The latter prices continued through 1952. Plaintiffs were required to meet Pennsylvania's pricing structure and to sell at a loss. In November 1953, Pennsylvania's prices fell to $3.00 a dozen, although costs of production had increased. Pennsylvania made a small profit in 1952 but suffered losses in 1953 and 1954. On September 12, 1952, plaintiffs sent a second letter to Flanagan accusing Pennsylvania of attempting to confuse potential customers by packaging "Liqui-Size" in a bottle which was identical to the bottle in which "Nix-Size" was sold, and of subjecting the plaintiffs to a staggering and unfair competitive burden. This letter was likewise unanswered. A final letter was sent to Flanagan on March 11, 1955 in which plaintiffs beseeched him to put an end to imitation of the plaintiffs' products. As before, no answer was forthcoming.
 
 
 38
 Plaintiffs' losses on their sales of "Nix-Size" after 1950 depleted their capital and their business was gradually throttled. By 1956 they could no longer fill their orders and this was an important factor in the eventual destruction of their entire business.
 
 
 39
 Plaintiffs presented the following testimony with respect to the alleged participation of Schultz in the conspiracy.
 
 
 40
 Schultz operated the largest chain of wallpaper and paint stores in the Philadelphia and Camden areas. It was one of the plaintiffs' best customers and it knew it. Schultz tested the plaintiffs' "Nix-Size" in September, 1949 and it then purchased it in increasing quantities for some time. By 1950 Schultz was selling "Nix-Size" in every one of its stores. At that time it also began purchasing the plaintiffs' wet paste. It discontinued purchases of the wet paste on October 28, 1950. It continued its purchases of "Nix-Size" until March 1952. At that time Schultz telephoned the plaintiffs that it had been given a sample of Pennsylvania's "Liqui-Size" and had been assured by Flanagan that "it was just like `Nix-Size'"; that Flanagan had given it permission to sell the product under Schultz' private label of "Magicoat Liquid Size", at a price lower than the price of "Nix-Size"; that Schultz would no longer buy "Nix-Size".
 
 
 41
 Earlier, in November, 1951, Schultz told the plaintiffs that Flanagan was "gunning mad" because it had been purchasing the plaintiffs' wet paste and that "if you fellows continue to sell wet paste, this fellow could put you out of business. He is just the fellow who can do it."
 
 
 42
 It was testified that individuals who attempted to purchase "Nix-Size" at various Schultz stores were invariably told "We don't have `Nix-Size' in stock. We sell `Magicoat', it is the same thing," or that "Magicoat" was in fact "Nix-Size".
 
 
 43
 Plaintiffs also testified that Schultz at one time repackaged "Nix-Size" under its own label and that at another time it sold "Nix-Size" at sharp discount, "at the instigation of Pennsylvania."
 
 
 44
 Spiro, a Schultz partner, testified that "Nix-Size" was more salable than Pennsylvania's "Liqui-Size", and Schultz' privately-labeled "Magicoat", and that Schultz' mark-up on its private brand was less than the difference between the cost and the fair trade price of "Nix-Size". Thus, Schultz actually sacrificed potential profits when it sold Pennsylvania's product and its own, instead of the plaintiffs' "Nix-Size".
 
 
 45
 In defense, Flanagan denied Pennsylvania ever had any intention to put the plaintiffs out of business, or having any motive for doing so, or that he ever made a statement that he would do so, and Schultz denied entering into any conspiracy with Pennsylvania with respect to the plaintiffs, and contended that its business with the plaintiffs was insignificant, as was its sales of wallpaper paste.
 
 
 46
 The trial judge in his charge to the jury correctly submitted to it in sharp and precise focus the issues it was to resolve.
 
 He said:
 
 47
 "A conspiracy under the Anti-Trust Acts is an understanding with respect to engaging in a course of conduct the result of which is to restrain trade. One defendant alone cannot be guilty of being a conspirator. A conspiracy must contain two or more persons or corporations.
 
 
 48
 "One need not trade with anyone with whom he does not wish to trade. One need not trade with anyone or everyone who wishes to do business with him. One need not compete in a half-hearted or constrained manner. But there are limitations on one's business activity. One may not make a decision not to do business with another as a result of a conspiracy to drive the other party out of business. One may not compete against him in various ways (to be detailed throughout this charge), as a result of or after having joined a conspiracy the purpose of which is to drive the competitor out of business.
 
 
 49
 "The crucial question in this case is: did two or more of the defendants combine, conspire or agree to do various acts, such as not selling to the plaintiff on credit, not buying from the plaintiffs, and not competing fairly with the plaintiffs for the purpose of driving the plaintiffs out of business * * *. Did the defendant Samuel Schultz and Company and the defendant Atlas Wallpaper & Paint Company cease purchasing and selling the plaintiffs' products as a result of a business decision on their part or to assist Pennsylvania Paste Company in driving plaintiffs out of business? Did the defendant Pennsylvania Paste Company act towards the plaintiffs as it did, (their actions, of course, to be determined by you), as a result of independent business judgment on its part or as a result of an agreement, combination or conspiracy, or while inviting others to assist it in acting in destroying the plaintiffs' business?" (emphasis supplied)
 
 
 50
 The trial judge gave further required instructions relating to tests to be applied by the jury in answering the posed questions.
 
 
 51
 He specifically charged that while conspiracy may be proved by circumstantial or inferential evidence alone
 
 
 52
 "* * * it is necessary not only that the circumstances proven by the evidence shall reasonably give rise to an inference of conspiracy, but also that no other equally reasonable inference can be drawn from the same circumstances. If two equally reasonable inferences can be drawn from the circumstances proved by the evidence, one consistent with the evidence of conspiracy and the other inconsistent, you should not infer the existence of conspiracy from such evidence alone."
 
 
 53
 He also charged that the evidence must show (1) that someone "has embarked on an unlawful course of action with which cooperation is invited, and (2) that the defendant, or any other person who is claimed to have been a conspirator, knowingly and willfully participated in the accomplishment of that plan with the intent to advance or further some object or purpose of the plan."
 
 
 54
 On review of the record I am of the opinion that the trial judge was right when, in denying the defendants' motions for a directed verdict at the close of the plaintiffs' case, he said "sufficient factual questions have been presented to allow the jury to rule on the issues" with respect to the case against Pennsylvania, and that "substantial evidence has been introduced" with respect to Schultz' participation in a conspiracy, and that he was wrong when, in his "Order and Direction for Judgment n. o. v." he stated "there is a total failure and lack of evidence to prove the essential elements of plaintiffs' case relating to guilt of Samuel Schultz & Co." and that, accordingly the jury's verdict cannot stand against Pennsylvania because "Pennsylvania is legally unable to conspire with itself and thereby violate § 1 of the Sherman Act [15 U.S.C. § 1.]." On the score of the latter finding it must be observed that the trial judge has not found that the evidence was insufficient to sustain the jury's implicit finding that Pennsylvania acted to destroy the plaintiff's business.
 
 
 55
 It can be said of the evidence here that reasonably fair-minded men may differ as to the conclusions to be drawn from it. That being so, under settled law it remains in such a situation for the jury to select the conclusion it deems proper.
 
 
 56
 As was said in Myers v. Reading Co., 331 U.S. 477, pp. 485-486, 67 S.Ct. 1334, p. 1339, 91 L.Ed. 1615 (1947):
 
 
 57
 "* * * where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."
 
 
 58
 That there was here evidence to sustain the jury's finding that Schultz conspired with Pennsylvania to drive the plaintiffs out of business, was expressly found by the trial judge, in his opinion denying the defendants' motion for a directed verdict at the conclusion of the plaintiffs' testimony.
 
 In that opinion the trial judge said:
 
 59
 "Schultz is charged with `discontinuing and refusing to resume * * * [his] purchases of wall size eliminator' from plaintiffs, `with knowledge of Pennsylvania Paste's intent' to drive the plaintiffs out of business.
 
 
 60
 "Evidence has been introduced of Schultz' discontinuance of purchases from plaintiffs and his refusal to resume purchases. Evidence has also been introduced to the effect that plaintiff Dovberg told Schultz of Pennsylvania's alleged intent and that Schultz was aware of it. * *[14]
 
 
 61
 "Plaintiffs charge that `at the instigation of Pennsylvania Paste * * [Schultz] sold the wall size eliminator * * * purchased from Pennsylvania Paste as being, or being the same thing as Nix-Size'. Substantial evidence has been introduced to this effect." (emphasis supplied)
 
 
 62
 At a later point in this same opinion, the trial judge made statements quoted earlier in his opinion that, as to Pennsylvania, "A sufficient quantum of evidence has been adduced by plaintiffs to allow the case against this defendant to go to trial" and, "In short, sufficient factual questions have been presented by plaintiffs to allow the jury to rule on the issues"; and as to Schultz, that "Evidence has been adduced that Schultz knew of Pennsylvania Paste's illegal aim; that Schultz acted in furtherance of it * * * [and] such evidence is legally sufficient to allow the jury to rule on the allegations."
 
 
 63
 The trial judge did a complete about-face when he subsequently found in granting judgment n. o. v. that "There has been total failure and lack of evidence to prove the essential elements of plaintiffs' case relating to guilt of Samuel Schultz & Co."
 
 
 64
 I would reverse the Order granting the defendants' motions to vacate and set aside the judgment in favor of the plaintiffs for the reasons stated at the outset of this dissent, namely, the evidence in the instant case viewed in the light most favorable to the plaintiffs, as it must be, reasonably permitted a jury finding that Pennsylvania acted to destroy the plaintiffs' business and that Schultz was aware of its purpose and design and that it acted in concert with Pennsylvania to accomplish it.
 
 
 65
 BIGGS and STALEY, JJ., concur in the views expressed in this opinion.
 
 
 
 Notes:
 
 
 [1]
 Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 697, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)
 
 
 [2]
 15 U.S.C.A. §§ 1 and 2
 
 
 [3]
 15 U.S.C.A. §§ 13, 14, and 15
 
 
 [4]
 The opinion of the District Court denying these motions is unreported
 
 
 [5]
 The defendants had timely moved for a directed verdict pursuant to Rule 50(b) of the Federal Rules of Civil Procedure
 
 
 [6]
 The "Order and Direction for Judgment" is not reported
 
 
 [7]
 The relevant portion of Rule 50(b) provides:
 "If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed."
 
 
 [8]
 Berry v. United States, 312 U.S. 450, 452-453, 61 S.Ct. 637, 638, 85 L.Ed. 945 (1941)
 
 
 [9]
 Morris Brothers Lumber Company v. Eakin, 262 F.2d 259, 263 (3 Cir. 1959), to the same effect see Wong v. Swier, 267 F.2d 749, 753 (9 Cir. 1959)
 
 
 [10]
 McCoy v. Moore, 78 U.S.App.D.C. 346, 140 F.2d 699, 700 (D.C.Cir.1944)
 
 
 [11]
 15 U.S.C.A. § 1
 
 
 [12]
 15 U.S.C.A. § 2
 
 
 [13]
 A wall size eliminator is a product which, when added to conventional wallpaper paste, eliminates necessity of a separate sizing operation
 
 
 [14]
 The plaintiff Maurice Dovberg testified that on March 13, 1952 a Schultz partner, Samuel Schultz, called him on the phone and "told me that Mr. Flanagan of the Pennsylvania Paste Company was in to see him and left him a sample of a product just like Nix-Size. In fact, he assured me, he said `It is exactly the same as your Nix-Size. This is a sample of what he is going to manufacture for me under our private label.'
 "He also told me that he had a contract, an agreement, that he had on his desk to sign, and when he signed that agreement, that in effect, he would stop buying Nix-Size, and after he consumed, sold out, his present inventory, he wouldn't buy from us again. He said he tried Pennsylvania's Nix-Size — that's how he referred to it — `and I found it to be exactly the same as yours, and Mr. Flanagan is going to sell it to me for much less than what I can get it from you.'
 "At this point I advised Sam Schultz that we had patents pending, that we hadn't licensed anyone to manufacture any imitation or similar product as ours, especially where such products would serve the same general principles, and I told Sam Schultz that I can't conceive that Mr. Flanagan would be able to sell him an imitation of our Nix-Size in exactly the same form, the same product, at a lesser price, unless he was enforcing the threat that he had made to me that he would produce the same product, sell it for less or below the cost I could afford to sell ours, in an effort to put us out of business; and I told Sam Schultz that if he sold Mr. Flanagan's manufactured product under his exclusive label, and if they did anything in joining an effort, combined, to hurt our business, that I would have to hold Mr. Schultz as responsible as I would the Pennsylvania Paste Company if they damaged our business.
 "Q. What did Mr. Schultz say then?
 "A. Well, he laughed and he said, `It was nice doing business with you, Kid,' and that terminated the conversation."