**Michael J. HAMILTON, Plaintiff,**

v.

**WADSWORTH PUBLISHING COMPANY, INC., Defendant.**

**Civ. A. No. 78–421–JLL.**

United States District Court,
D. Delaware.

June 14, 1984.

Edward B. Carter, Jr. of Kimmel & Spiller, Wilmington, Del., for plaintiff; Jay C. Carlisle, White Plains, N.Y., of counsel.

Somers S. Price and John E. James of Potter Anderson & Corroon, Wilmington, Del., for defendant.

## OPINION

LATCHUM, Senior District Judge.

### I. BACKGROUND

Plaintiff, Michael J. Hamilton ("Hamilton"), brought this diversity [1] action against defendant, Wadsworth Publishing Company, Inc. ("Wadsworth"), seeking to recover damages from Wadsworth for alleged fraudulent or negligent misrepresentations made to him by Wadsworth's agents in connection with certain stock options that Hamilton contends were to be issued to him. (Docket Item ["D.I."] 73 at 1.)

On March 19, 1984, a jury trial began in this Court. At the conclusion of plaintiff's case, Wadsworth moved for a directed verdict, upon which this Court reserved decision. At the conclusion of defendant's

---

**1.** Jurisdiction exists by virtue of 28 U.S.C. § 1332 because plaintiff is a citizen of the State of New York and the defendant is a corporation incorporated under the laws of the State of Delaware with its principal place of business in California. (D.I. 1 at 1.) The amount in controversy exceeds the sum or value of $10,000 exclusive of interest and costs. (*Id.*)

case, Wadsworth renewed its motion for a directed verdict upon which the Court again reserved decision. After closing arguments and the jury charge, the case was sent to the jury. A mistrial was declared by the Court when the jury reached an impasse after almost two days of deliberation.

After dismissal of the jury, Wadsworth renewed its application for a directed verdict. The Court requested the defendant to file a formal motion and that the parties brief that motion. On April 2, 1984, Wadsworth filed a timely motion for directed verdict pursuant to Fed.R.Civ.P. 50. (D.I. 89.) One of the nine grounds for Wadsworth's motion [2] reads as follows:

> Defendant's alleged agents, Myron Tucker and Donald Jones, made no representations to plaintiff concerning stock options in Wadsworth which would rise to the level of misrepresentation under the governing law of the Commonwealth of Massachusetts.[3]

(D.I. 90 at 2.)

## II. FACTS

In November 1973, Hamilton was employed by Cahners Books Inc. ("Cahners") [4]

as an editorial director. (D.I. 88 at 8.) Although Hamilton never had an employment contract with Cahners, during 1977, he was paid a salary at the rate of $30,000 per year and had the use of a Cahners' company car. (D.I. 73 at 2.) In 1977, Hamilton's job description read "Publisher, Professional Reference Dept." (Defendant's Exhibit ["DX."] K.)

Another publisher at Cahners during 1977 was Myron Tucker. (D.I. 73 at 2.) Tucker, who had joined Cahners in March of 1971 as the director of marketing, was in charge of the "Education Dept." (D.I. 83 at 5; DX. K.) In 1974, Tucker became vice president of marketing for Cahners. (D.I. 83 at 7.) Then in 1976, Tucker became vice president of Cahners Book Division. (*Id.* at 9.) Both Tucker and Hamilton reported to Walter Cahners, vice president of Cahners Book Division. (*Id.* at 6.)

On March 24, 1977, Walter Cahners called a meeting to announce that Wadsworth Publishing Co. was going to acquire the assets of the parent company Cahners Publishing Company and change the name of the company to CBI Publishing. (D.I. 88

**2.** In support of its motion for a directed verdict, Wadsworth asserted that the testimonial and documentary evidence presented at trial, established *inter alia* that:

1. Wadsworth's alleged agents Myron Tucker and Donald Jones made no representations to Hamilton concerning stock options in Wadsworth which would rise to the level of misrepresentations under the governing law of the Commonwealth of Massachusetts.

2. Tucker was not acting as an agent of Wadsworth on any occasion when he made any statements to Hamilton concerning stock options.

3. Hamilton did not rely on or reasonably rely on Wadsworth's alleged agents' alleged representations concerning stock options of Wadsworth.

4. Hamilton did not sustain damage as the result of his alleged reliance on Wadsworth's alleged agents' alleged representations concerning stock options in Wadsworth.

5. The alleged negligent representations made by Wadsworth's alleged agents did not proximately cause Hamilton's alleged damages.

6. Hamilton was contributorily negligent in relying on the alleged misrepresentations of Wadsworth's alleged agents.

7. Hamilton failed to establish the value of any alleged damages with reasonable certainty at the trial.

8. Hamilton did not satisfy the undisputed vesting requirements that attached to the stock options at issue.

9. Because of the other factors discussed herein, Hamilton failed to establish essential elements of proof for each of his causes of action against Wadsworth and is not entitled to any relief against Wadsworth.

(D.I. 89.) Because the Court finds that Hamilton has failed to prove that any misrepresentation was made by Wadsworth's agents, this Court need not reach the remaining eight grounds for a directed verdict.

**3.** This Court has previously determined in this case that the law of Massachusetts applies with respect to intentional and negligent misrepresentation. (D.I. 54.)

**4.** Cahners Books Inc., was a division of Cahners Publishing Co. Prior to July 1, 1977, Cahners was neither affiliated with nor controlled by Wadsworth. (D.I. 73 at 2.)

at 10.) The meeting was attended by the management of Cahners including: Tucker, Hamilton, John Mead (Business Manager), and John Coleman (Director of Marketing.) (*Id.*) At this meeting, Walter Cahners introduced Donald Jones (a former Chief Executive officer of Addison Wesley), as a representative of Wadsworth. (*Id.* at 13, 49–51.) In early April 1977, Hamilton met privately with Donald Jones. (*Id.* at 12.) Hamilton asked Jones about the structure of the new company and in particular what role Jones felt Hamilton would play in it. (*Id.*) Hamilton testified that:

> Mr. Jones told me that he thought I was important to the management team, since there were only three major managers, and he wanted to keep the team in place. So he said, "If you will stay with the company in your present position, basically, we will do three things for you. One, we will provide you with a $2,000 bonus. Two, we will provide you with a company car. And three, you will receive a stock option in line with your position."

(*Id.* at 14.)

Hamilton also testified that he got the $2,000 bonus and the company car. (D.I. 88 at 14.) Jones made no mention of any specific number of stock options or amount or any specific delivery date or any conditions concerning the stock options. (*Id.* at 15, 55, 73, 81–82.)

The actual acquisition of the Cahners' assets by Wadsworth became official on July 1, 1977.[5] (D.I. 73 at 2.) The new company, CBI Publishing Company, Inc. ("CBI"), became a wholly-owned subsidiary of Wadsworth. (*Id.*) After the acquisition, Tucker was named vice president and general manager of CBI and became Hamilton's immediate supervisor. (D.I. 83 at 104.)

On August 5, 1977, Tucker attended a CBI board of directors meeting in California. (D.I. 83 at 45.) Attending the meeting were Tucker, Robert Sass (Secretary of CBI), and 4 members of the CBI board of directors. (*Id.;* DX. A.) At that meeting Tucker asked the board of directors to consider "certain of the Company's employees" for stock options. (*Id.* at 45.)[6] No specifics were mentioned with respect to who these employees were, the amount of the options or the number of shares. (*Id.* at 46.) On August 8, 1977, after Tucker returned to Massachusetts from the CBI board meeting in California, he prepared a memorandum concerning the stock options and sent it to several employees[7] including Hamilton. (*Id.* at 46.) The memorandum stated:

> I have discussed with our parent company, Wadsworth, the *possibility* of *our* receiving a stock option since Wadsworth is a stock company and traded on the over-the-counter market. It appears *very likely* that we will receive a stock option after the Wadsworth committee meets in approximately one month's time.

(DX. C.) (Emphasis added.) Again, no specifics were mentioned with respect to amount of stock, terms or delivery date. (D.I. 88 at 17.)

On September 27, 1977, Tucker and Hamilton had a heated argument over Hamilton's refusal to review certain computer sheets concerning projected sales for 1978.[8] (D.I. 83 at 53.) Hamilton became extreme-

---

**5.** Although Hamilton began his employment with CBI on July 1, 1977, he did not have an employment contract. (D.I. 73 at 2.)

**6.** The minutes of the meeting state:

> Mr. Tucker proposed that certain of the Company's employees be considered eligible for stock options under the 1974 Incentive Stock Option Plan for Key Employees of Wadsworth Publishing Company, Inc. The Board directed Mr. Tucker to submit his proposals to Mr. Warnken for a decision regarding eligibility and number of shares. (DX. A.)

**7.** The memorandum was sent to John Mead, Mike Hamilton, Phil Mason, Gary Conger and Derek Holman. (DX. C.)

**8.** Even before this incident, it was a well known fact that Hamilton and Tucker maintained a basic difference in publishing philosophy. (D.I. 83 at 12–13.)

ly vocal with Tucker, even to the point of using profanity. (*Id.* at 54.)

On September 30, 1977, Tucker again met with Hamilton. (D.I. 88 at 22.) At this meeting Tucker informed Hamilton that he intended to place Hamilton on a three-month probationary period during which Tucker would evaluate Hamilton's performance and attitude. (D.I. 83 at 64.) In addition, Tucker told Hamilton that Hamilton would not be getting a new company car. Tucker testified "that was temporarily out because I didn't know what was going to happen in this three month period." (*Id.* at 65.)

Hamilton initially accepted the offer of probation, but on Saturday, October 1, 1977, he decided that the terms of the probation were unacceptable, and Hamilton telephoned Tucker at the latter's home to tell Tucker that Hamilton was "going to have to resign." (D.I. 88 at 25, 27.) On Monday, October 3rd, Hamilton submitted his written resignation to Tucker and remained with CBI until October 14, 1977.[9] (*Id.* at 28.)

During the latter part of September, 1977, the Board of Directors of Wadsworth authorized the issuance of the stock options for certain CBI employees and on September 28, 1977, the stock options were signed at Wadsworth's headquarters in California by Richard P. Ettinger, Chairman of the Board of Wadsworth. (DX. O.) On October 24, 1977, the stock options, with various vesting requirements for several key employees of CBI, were personally delivered to Tucker in Massachusetts by Rudolph Scholz, vice president and finan-

cial officer of Wadsworth. (D.I. 83 at 77–78.)

### III. THE DIRECTED VERDICT STANDARD

Pursuant to Fed.R.Civ.P. 50(b),[10] the court can decide whether or not there is any question of fact to be submitted to the jury and whether any verdict other than the one directed by the court would be erroneous as a matter of law. In addition, Rule 50(b) allows the court to reserve the decision of this question of law until after the case has been submitted to the jury and the jury has either reached a verdict or an impasse. *See* C. Wright and A. Miller, Federal Practice and Procedure § 2521 (1971).

It is the law of this Circuit, that where the movant does not bear the burden of proof, the trial court must expose the evidence to the strongest light favorable to the party against whom the motion is made and give him the advantage of all inferences reasonably capable of being drawn therefrom. *Denneny v. Siegel,* 407 F.2d 433 (3d Cir.1969); *see also Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Dovberg v. Dow Chemical Co.,* 353 F.2d 963 (3d Cir.1965), *cert. denied,* 384 U.S. 907, 86 S.Ct. 1344, 16 L.Ed.2d 360 (1966). In addition, there are two factors which this Court must not consider in its review of the evidence—the credibility of the evidence and the weight of it. *Brady v. Southern R. Co.,* 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943); *Wylie v. Ford Motor Co.,* 502 F.2d 1292 (10th

**9.** Hamilton testified that he did not have any job offers available to him at the time he was meeting with Jones in April of 1977. (D.I. 88 at 56, 61–62.) In fact, Hamilton testified that he never had any job offers from any employers other than CBI between January 1, 1977 and the date he left CBI. (*Id.* at 61–62.)

**10.** Fed.R.Civ.P. 50(b) states in pertinent part:
 (b) *Motion for Judgment Notwithstanding the Verdict.* Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the

action to the jury subject to a later determination of the legal questions raised by the motion.... A party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, ... may move for judgment in accordance with his motion for a directed verdict.... If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial.

Cir.1974); *Burchill v. Kearney-National,* 468 F.2d 384 (3d Cir.1972).

## IV. INTENTIONAL OR NEGLIGENT MISREPRESENTATION

The Massachusetts Supreme Judicial Court has articulated the standard for the intentional tort of fraudulent misrepresentation to be that:

> [t]he plaintiff must prove "that the defendant made a *false* representation of a material fact *with knowledge of its falsity* for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage."

*Danca v. Taunton Sav. Bank,* 385 Mass. 1, 429 N.E.2d 1129, 1133 (1982) (emphasis added). *See also Graphic Arts Finishers, Inc. v. Boston Redevelop. Auth.,* 357 Mass. 40, 255 N.E.2d 793, 796 (1970); *Barrett Associates, Inc. v. Aronson,* 346 Mass. 150, 190 N.E.2d 867, 868 (1963); Restatement (Second) of Torts §§ 525, 526 (1977).

As for negligent misrepresentation, the elements of that tort are set forth in the Restatement (Second) of Torts § 552 (1977):

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, *supplies false information for the guidance of others* in their business transactions, is subject to liability for *pecuniary loss caused to them by their justifiable reliance upon the information,* if he fails to exercise reasonable care or competence in obtaining or communicating the [false] information.

(Emphasis added.) *See also Danca v. Taunton Sav. Bank,* 385 Mass. 1, 429 N.E.2d 1129 (1982); *Kozdras v. Land/Vest Properties, Inc.,* 302 Mass. 34, 413 N.E.2d 1105 (1980); *Craig v. Everett M. Brooks Co.,* 351 Mass. 497, 222 N.E.2d 752 (1967).

■ This Court, in applying these criteria to this case, finds that there was *no* evidence presented at trial to support a verdict indicating that there was an intentional or negligent misrepresentation of a material fact made by either Jones or Tucker. Hamilton testified that Jones told him in early April, 1977, that in consideration for Hamilton's decision to continue with the Cahners Book Division after the sale of that division, Hamilton would be given stock options in line with his position. (D.I. 88 at 14.) There was no mention, however, of *when* Hamilton would receive such options, *how* he would receive them or the precise *number* that he would be granted. (*Id.*) No other discussion was ever held between Hamilton and Jones since Hamilton believed that if he had any other questions about stock options, Hamilton should ask Tucker. (*Id.* at 15.) Hamilton knew, however, that any options to be granted were to be issued under the Wadsworth 1974 Stock Option Plan. (*Id.* at 56.) Hamilton also admitted that he had reviewed the terms of the Wadsworth stock option plan before his departure from CBI. (*Id.*) In fact, Hamilton knew that only the Wadsworth Stock Option Committee could approve the granting of stock options. (*Id.* at 70.)

Hamilton also admitted that Tucker informed him by the August 8, 1977 memorandum and on other occasions that "[i]t is very likely that the management team will receive stock options" and that he was working on the options for all key employees. (D.I. 88 at 17, 20, 27, 82, 83–84, 88.) Hamilton claimed that this was a confirmation of earlier conversations. (*Id.* at 83–84.)

Tucker stated that he first learned of the possibility of Wadsworth stock options after discussions with Wadsworth employees who were not in the senior management group. (D.I. 83 at 28–29.) Subsequently, in September, Tucker learned only that Wadsworth had approved the issuance of options to CBI personnel. (D.I. 83 at 49.) He learned this before Hamilton resigned from CBI. (*Id.*) When asked by Hamilton about the options at that time, Tucker told Hamilton: "I understand that they have been approved and they are coming." (*Id.* at 49, 116.)

Hamilton does not dispute that Tucker told him that the options were coming in late September or October, 1977. (D.I. 88

at 66.) Hamilton's only complaint was that Tucker could not tell Hamilton *when* the options were coming. (*Id.* at 82.) By the time Hamilton asked Tucker about the options in September, Hamilton had read the option plan and knew that it was up to the Wadsworth Stock Option Committee to approve the options for issuance and that the Committee was in complete control of the program. (*Id.* at 83.)

On September 27, 1977, when Hamilton asked Tucker about options, Tucker again replied that Wadsworth was working on the options, but he knew nothing more. (D.I. 88 at 89.) According to Hamilton, Tucker gave the same response on September 29, 1977 when he was again asked about the options. (*Id.*) On September 30, 1977, Hamilton recalls Tucker saying he didn't "know when they [the options] are forthcoming." (*Id.* at 92.) Tucker had the same response on October 1, 1977. (*Id.* at 93.) [11] Finally, according to Hamilton, on October 3, 1977, Tucker again said that he had no further knowledge about the options. (*Id.* at 94.) That was the last conversation between Hamilton and Tucker prior to Hamilton's departure from CBI on October 14, 1977. (*Id.* at 95.)

Finally, it is undisputed that Wadsworth through Rudolph Scholz did eventually attempt to deliver stock options to CBI for Hamilton. (D.I. 83 at 77.) The undisputed evidence shows that Tucker had no prior knowledge as to the amount of Hamilton's options or when they would arrive. (*Id.* at 77–78, 111, 132.) On October 24, 1977, Scholz, without prior announcement, arrived at CBI in Massachusetts with the Wadsworth options including an option for 600 Wadsworth shares for Hamilton. (*Id.* at 132.) Tucker had not been previously notified of Scholz's visit and it was therefore a complete surprise when Scholz appeared with the options. (*Id.* at 77–78, 132.) At that time Scholz learned firsthand that Hamilton had resigned and was no longer eligible to receive stock options. It was only then that Hamilton's options were cancelled.

The conclusion that must be drawn from the evidence presented at trial, even giving plaintiff every benefit of the doubt, is that there was no intentional or negligent misrepresentation made to Hamilton by Wadsworth. The trial record is completely devoid of any proof that either false information or a false statement was ever made to Hamilton by Wadsworth concerning the issuance or delivery of Wadsworth stock options. Jones never made any definite statement about the stock options and Hamilton knew that only the Wadsworth Stock Option Committee had the power to issue the options. It is also readily apparent from the evidence presented that Tucker told Hamilton everything he knew. It appears that the only basis for Hamilton's claims of misrepresentation is his factually unsupported claim that Tucker knew that the Wadsworth options had been signed by Richard Ettinger on September 28, 1977, and were to be conveyed to Boston by Rudolph Scholz at some time in October, 1977, but that he did not tell Hamilton of that fact.

In support of this contention, Hamilton offers nothing more than conjecture or speculation that Tucker somehow had such information and refrained from divulging it. Hamilton offered no evidence of any kind to show that Tucker knew that the options had been signed by Ettinger.

11. Hamilton testified that Tucker allegedly told him on October 1, 1977, that he knew nothing about the options. However, Hamilton explained this statement one question later when his own counsel asked:
Q. Didn't he say the stock options were coming, Mr. Hamilton?
A. He had said they had been coming for several months. But by that time, I didn't have any more belief.

(D.I. 88 at 27.) In fact, Hamilton testified that Tucker told him during the October 1, 1977 telephone call, "I am working on them, but I don't know any more than I knew yesterday." (*Id.* at 93.) Tucker also told Hamilton that he had "no *further* knowledge" concerning the stock options on October 3, 1977. (*Id.* at 94.) (Emphasis added.)

Moreover, the undisputed evidence shows that Tucker kept the CBI employees, including Hamilton, informed of developments concerning the stock options as he learned of them.

## V. CONCLUSION

A directed verdict should be granted when the probative force of the non-movant's case, "[i]s so weak that it only raises a mere surmise or suspicion of [the] existence of facts sought to be established." 88 C.J.S. *Trial* § 258, p. 687, n. 61 (1955). "Where the issues are ones for resolution by the jury, the judge may deprive the jury of its role at trial only where such action is necessary to guard against a verdict founded solely on *'mere speculation.'* " *Columbia Metal, etc. v. Kaiser Alum., etc.,* 579 F.2d 20, 25 (3d Cir.1978), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978) (emphasis added). *See also Viking Theatre Corp. v. Paramount Film Distributing Corp.,* 320 F.2d 285 (3d Cir.1963), *aff'd,* 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1964).

In the instant case, Hamilton's claim of intentional or negligent misrepresentation is not supported by any factual basis or rational inferences. Hamilton has failed to provide even a mere scintilla of evidence to support his claims and therefore, as the non-movant, he cannot defeat, with unsupported surmises, a motion for directed verdict. *Fireman's Fund Ins. Co. v. Videfreeze Corp.,* 540 F.2d 1171 (3d Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). This Court is unable to hold as a matter of law that the record is sufficient in terms of "that minimum quantum of evidence from which a jury might reasonably afford relief" to the plaintiff. Because of Hamilton's failure to present any evidence of intentional or negligent misrepresentation made to him, Wadsworth's motion for a directed verdict will be granted.

An order will be entered in accordance with this opinion.