### BERKELEY PUMP CO.
#### v.
### JACUZZI BROS., Inc.
#### No. 13517.

United States Court of Appeals
Ninth Circuit.
June 30, 1954.

Mellin, Hanscom & Hursh, Oscar A. Mellin, Leroy Hanscom, Jack E. Hursh, San Francisco, Cal., for appellant.

Naylor & Lassagne, Jas. M. Naylor, Frank A. Neal, San Francisco, Cal., for appellee.

Before HEALY, BONE and LEMMON, Circuit Judges.

BONE, Circuit Judge.

Appellant, Berkeley Pump Company (herein Berkeley) and appellee, Jacuzzi Bros. (herein Jacuzzi) are both California corporations engaged in the business of manufacturing and selling motor driven water pumps for use in so-called "deep wells" on small farms. The patent in suit is the property of Berkeley, being

Letters Patent U. S. No. 2,280,626, issue date April 21, 1942.

Berkeley brought suit against Jacuzzi, charging the latter with infringement of the Berkeley Pump device, and demanding damages and reasonable attorney's fees. At the conclusion of the plaintiff's case in chief the lower court directed the jury to return a verdict in favor of Jacuzzi.[1] Judgment was entered on this verdict and this appeal followed.

In its answer to the Berkeley suit, Jacuzzi, among other matters, put the validity of the patent in suit in issue by alleging that the Berkeley pump was not an invention and that the Letters Patent were invalid; that the pump alleged to be patented did not require the, or any, exercise of the inventive faculty; that the claimed patent was invalid because anticipated in every material and substantial part as disclosed and described in prior letters patent of the United States and foreign countries or in printed publications prior to the alleged invention or discovery of the patentee of the Berkeley patent; that for more than one year prior to the alleged application for letters patent on the Berkeley device, this alleged invention, and every material and substantial part thereof, was in public use or on sale in the United States; that the alleged invention is devoid of novelty or utility, and therefore the letters patent is null and void.

Other contentions by way of defense were presented in the Jacuzzi answer, but in view of the obvious basis of the lower court's order in directing a verdict, we think that they need not be considered.

1. The only testimony describing the structure, component parts and the mechanism of the pump apparatus of both parties was given by the President of Berkeley. His testimony also dealt with the mode of operation and results claimed for the Berkeley combination pump device. He described a so-called "shallow well" as one where the water is within reach of a common centrifugal pump, or within about twenty feet of the pumping surface; that a "deep well" is all the way from twenty-five to five hundred feet or deeper. He described the Berkeley pump as one designed for use in a "deep well."

Incidentally, it should be pointed out that in argument here counsel for Berkeley advised us that the devices here involved are not the devices considered in our decision in Jacuzzi Bros., Inc., v. Berkeley Pump Co., 9 Cir., 191 F.2d 632.

At the close of the plaintiff's prima facie case, counsel for Jacuzzi moved for a directed verdict on the premise that the evidence of plaintiff revealed that the subject matter of the patent in suit is not a valid patent. Thereafter the trial judge instructed the jury to return a verdict for the defendant, stating that he was thus instructing the jury "as a matter of law." Obviously, the directed verdict rested on the conclusion of the judge that, in light of all the evidence adduced, it was his judicial duty to direct such a verdict at the hands of the jury.

### Mechanical Combinations

At the outset it should be pointed out that we are here dealing with a mechanical device which concededly involves only a combining of old elements all of which were well known in the prior pump art. Under the pleadings the most vital question to be answered is whether the Berkeley combination in suit constitutes patentable invention.

In a recent decision, Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 130, 95 L.Ed. 162, hereafter referred to as A & P Tea, the Supreme Court considered and disposed of the problem of what sort of combinations the lower courts are free to regard as patentable inventions in the mechanical field.[2] In this decision it established the criteria and standards which must now be ap-

---

2. We summarize what we conceive to be the now exacting rule laid down in the A & P Tea case. There the court cites with approval its former decision in Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545–549, 58 S.Ct. 662, 82 L.Ed. 1008, wherein it said: " 'The mere aggregation of a number of old parts or elements which, *in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them*, [the old parts] is not patentable invention.' " (Emphasis supplied.) The court goes on to say in A & P Tea that "the key to patentability of a mechanical device that brings old factors into co-operation is presence or lack of invention"; that the concept of invention "is inherently elusive" when applied to such combinations, as a consequence of which affirmative or general definitions provide no reliable answer as to whether the *variations* to be relied upon in a particular case is anything more than ordinary and simple mechanical skill. See footnote 6 in A & P Tea case.

The court also was at pains to point out that "The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable", and it added the admonition that "Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans.'

From the foregoing language we must and do assume that the court was simply saying that where a mechanical combination device represents only an integration of various old elements and the combination clearly reveals that its old elements thus brought into conjunction or concert do not *functionally operate differently therein* than they did before integration, then it is not a patentable invention. In other words, this sort of an integration does not add to the sum of useful knowledge or to the total stock of knowledge and the expert mechanical skill employed in creating it has not made the device "exceeds the sum of its parts". If the evidence clearly establishes that the device is of the type just above described, it obviously lacks the quality of invention. In that event a trial judge is justified, as a matter of law, in directing a jury to return a verdict against patentability. And this rule applies regardless of the scope and breadth of the claims of such a patent, because patent claims may not override such established physical facts.

It is to be noted that in the A & P Tea case the Supreme Court was discussing only mechanical devices and their elements or component parts, and not elements in the world of chemistry or electronics where the elements may take on some new quality or function from being brought into concert.

In A & P Tea, we are admonished that we "should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements", thereby repeating in substance what the court said in Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 10, 67 S.Ct. 6, 91 L.Ed. 3. In several recent cases this court has applied the general principles enunciated by the Supreme

plied in determining whether a combination patent is valid. In Kwikset Locks v. Hillgren, 9 Cir., 210 F.2d 483, 486, certiorari denied, 347 U.S. 989, 74 S.Ct. 852 we commented on and applied the standard approved by the high court, and the rule we followed in Kwikset is applicable to the facts of the instant case. Therefore we have examined the record on appeal to determine whether or not it clearly establishes that the Berkeley device meets the rigid standards of invention we must apply, in default of which it must be regarded as an example of mechanical skill in assembling old elements *the previous functional operations* of which are not changed by their arrangement and inclusion in the device. And see our comments in Jacuzzi Bros., Inc., v. Berkeley Pump Co., 9 Cir., 191 F.2d 632, 637 where we discuss functional operations of old elements which are placed in aggregation. We note Berkeley's contention on this appeal that "the law *presupposes in a patentable combination* that the parts are separately old." The implications of this broad statement do not require comment in light of the cases we have noted.

### The Issues on Appeal

Appellant presents five claims of error. That the lower court erred: (1) in determining that the question of patentable invention was one of law to be decided by the court and not one of fact for the jury, (2) in determining factual questions of novelty, invention and validity, (3) in determining as a matter of law, in view of the evidence adduced, that the patent in suit did not disclose patentable invention, (4) in weighing the evidence and in effect denying appellant a jury trial, (5) in directing a verdict for appellee.

Appellee replies that the only question for disposition is whether the district judge acted within the legitimate scope of his powers in directing the jury verdict.

In the posture of the case on this appeal the issue of infringement need not be considered since the only testimony is that the Jacuzzi pump is a complete duplicate of the Berkeley pump in construction and mode of operation.

### The Evidence

Only two witnesses were called at the trial, and the testimony of Fred A. Carpenter takes up almost the entire record. He was President of Berkeley Pump Company, appellant, and the patentee of the patent in suit. He described in detail the structure, operation and function of the Berkeley pump (as well

---

Court in the above cited cases. See Photochart v. Photo Patrol, 9 Cir., 189 F.2d 625, certiorari denied Nov. 5, 1951, 342 U.S. 867, 72 S.Ct. 107, 96 L.Ed. 652, rehearing denied January 2, 1952, 342 U.S. 907, 72 S.Ct. 290, 96 L.Ed. 679; Jacuzzi Bros., Inc., v. Berkeley Pump Co., 9 Cir., 191 F.2d 632, 637; Himes v. Chadwick, 9 Cir., 199 F.2d 100; Kwikset Locks v. Hillgren, 9 Cir., 210 F.2d 483, certiorari denied 347 U.S. 989, 74 S.Ct. 852. The Kwikset case reiterates the rule of the A & P Tea case, i.e., that the old elements making up the device *must perform an additional and different function than they perform out of it.* The rigorous standard of patentable invention thus set by the Supreme Court has been given full recognition in all of these cases.

In our Jacuzzi case, supra, 191 F.2d at page 637, we stated that not only must old elements, when placed in aggregation, functionally operate therein differently than before, but we carefully pointed out that "there is no invention in the placing together of devices well known in the art, *however novel and useful may be the results * * *.*" (Emphasis supplied.) Such a conclusion is inevitable where the *results* of integration of old elements could readily be foreseen by mechanics skilled in the pump art.

And see our previous comment on "results" achieved by integration of old elements in Kalich v. Patterson Pacific Parchment Co., 9 Cir., 137 F.2d 649, 651, 652, where we spoke of situations where a judicious use of materials would produce *a result* to be expected from such selection. We there pointed out that a *recognition* of the fact that an expected result would follow, *is not invention.* We emphasized the principle that a change in form, proportion or degree does not reflect patentable invention "even though the changes * * * produce better *results.*" (Emphasis supplied.) In view

as other pumps, one of which will be noted later) with the aid of his own technical knowledge and experience, as well as drawings, schematic diagrams, physical exemplars and the file wrapper record of the patent in suit.[3]

In his testimony Carpenter frankly stated that he laid no claim to invention of any of the parts or elements incorporated in his Berkeley pump. His position is epitomized in the claim that his invention is "the complete concept of the entire system * * * what it will do, and how it does it." This boils down his argument to the end product of integration. He readily agreed that deep well turbine pumps were being manufactured and used prior to 1940, these employing impellers and turbine bowls like those used in the Berkeley device. In short, the claim of "invention" in this device resides in the "arrangement" of its elements, with their old functions carried over into combination to produce what he claims to be a particular result.[2]

Apparently one of the most efficient methods of raising large volumes of water from a deep-well is to install a series of turbine impellers within a pipe-line "casing," one above the other. Each impeller is somewhat like a wheel, which takes water in at its hub, and, by rotating rapidly, throws it with centrifugal force through its spokes and out at its rim. Thus each impeller receives water up from below through its center and in turn throws it upward by this centrifugal force. The impeller or impellers located within and at the bottom of the casing are always immersed in the water in the well. Depending upon the depth of the well, as many such turbine impellers may be connected together in series, one above the other, as is desirable for the well depth in any particular installation. Thus the water is forced up to the surface, at a relatively low pressure, into a "discharge chamber" at the top of the "casing" from which chamber the water is released through a large opening for irrigation purposes for small farms. Such pumps were in use prior to the advent of the Berkeley pump.

For high-pressure discharge (required for household use, or sprinkler systems) one could install another type of system, particularly if one had a so-called shallow-well. This would be a single wheel "impeller" of large diameter located at the top of the casing. This single impeller rotating very rapidly, which (like

---

of the cases we have noted we think that this principle must now be regarded as firmly imbedded in patent law.

3. Printed copies of various patents granted and patent applications therefor from the United States Patent Office were placed in evidence. These were Berkeley patent in suit No. 2,280,626, application filed November 2, 1940, letters patent issued April 21, 1942, together with a copy of proceedings thereon in the Patent Office; Fox patent, No. 2,112,651, 1938; the Ensslin patent, 1924, No. 1,494,595; the Jacuzzi patent, 1939, No. 2,150,799; the Jacuzzi patent, 1930, No. 1,758,400; Hollander patent, 1940, No. 2,215,505; the Whann patent, 1927, No. 1,642,914; the Spencer patent, 1908, No. 893,756; the Rateau patent, 1903, No. 730,842.

There was also introduced in evidence a drawing made by the President of Berkeley in April, 1934, depicting a vertical high pressure centrifugal pump at the top of a pump device, with an impeller and two pipes leading to the water in a "deep well." Apparently a patent on the pump device shown in this drawing was never issued although the record shows an application for a patent on this pictured device.

The short of it is that the documentary evidence made abundantly plain that all of the various mechanical elements embodied in the patent in suit were old and well known in the pump art at a time prior to the application for, and issuance of, the patent covering the Berkeley device. The earliest of the devices shown in these documents was patented in 1903.

It is not amiss to point out that patents issued prior to issuance of a patent in suit may always be shown as anticipation regardless of whether they are specifically presented in the pleadings, since this exposition of the prior art can always be looked to for the purpose of determining whether a claimed advance in the prior art is invention. Jacuzzi Bros., Inc., v. Berkeley Pump Co., 9 Cir., 191 F. 2d 632, 637.

2. See Note 2 on Page 788.

the aforementioned turbine impellers) would take water into its center and whirl it out at its periphery at high pressure, through an outlet. Pumps of this type were also in use prior to the advent of the Berkeley pump.

One unpatented combination pump (known as the "Advance Pump") bore a marked similarity to the Berkeley pump, although it preceded application for a patent on the Berkeley pump by a half-dozen years. This "Advance Pump" used a jet device to raise the water to the top of the casing, instead of using staged turbines. At the top of the casing, in addition to a discharge chamber, it had a high-speed centrifugal impeller which drew water from the discharge chamber and discharged it under high pressure. It had a low-pressure outlet from the discharge chamber, and a high-pressure outlet from the centrifugal impeller. In order to raise the water to the discharge chamber (at the top of the casing) part of the water discharged by the high-pressure centrifugal impeller was diverted down a shaft and into the jet, where the speed and pressure of that water was utilized to raise water from the well. Because this means of raising well water was less efficient than the staged turbine method (of the Berkeley pump) the "Advance Pump" could *not* discharge both high and low pressure water *simultaneously*. The low-pressure discharge could be closed, thereby providing adequate water for the jet and high pressure use; or the high-pressure outlet could be closed so that all of the high-pressure water would be utilized for raising water from the well most of which could be released through the low-pressure outlet. It was the use of the jet method of raising water from the well which kept the "Advance Pump" from being sufficiently efficient to perform both high and low pressure functions simultaneously.

Substantially all that was needed, however, to provide the needed "dual" capacity to convert the "Advance Pump" to the Berkeley pump in suit was to use turbine impellers to raise the water in the well, instead of the jet-type of construction it employed.

There was absolutely nothing new in the pump art about turbine impellers. Mr. Carpenter's testimony on cross-examination revealed the close ·similarity between the "Advance Pump" and the Berkeley pump. He answered questions about such modification by conversion of the "Advance Pump", as follows:

"Q. Now, looking at Defendant's Exhibit C, will you tell the ladies and gentlemen of the Jury what would happen were we to substitute an impeller type of pump in the well for the jet that we , see there in Defendant's Exhibit C [the Advance Pump] ? A. And connected with a shaft to the motor?

"Q. Yes, sir. A. Same as in—

"Q. Plaintiff's Exhibit 1–A [patented Berkeley pump] A. Plaintiff's Exhibit 1–A? If you changed all other parts as would be necessary to carry out the function, it is quite obvious that it would be like, would carry out a similar function to the [Berkeley] patented pump shown in Plaintiff's Exhibit 1–A.

"Q. And it is true, is it not, Mr. Carpenter, that in all substantial particulars, such a conversion of Defendant's Exhibit C would be constructed as plaintiff's Exhibit 1–A, the patented [Berkeley] pump, isn't that a fact? A. If I understand your question correctly is if one skilled in the art, after viewing the patented construction put a turbine on the bottom, would he obtain performance and objectives as outlined in Plaintiff's Exhibit 1–A, the answer would be yes."

Like the "Advance Pump," the Berkeley pump is essentially two pumps, arranged in sequence: one a deep-well turbine type pump to bring the water to the surface into a chamber, and the other a shallow-well type high-pressure pump to pump a small part of that water at high pressure. (The larger part of the water brought to the chamber is permitted to flow out at low pressure for irrigation purposes, without going through the high-pressure pump.)

On cross-examination, Mr. Carpenter also testified to this use of two well known pumps, one on top of the other:

"Q. I would like to ask you specifically if * * * [in] the cutaway of the Berkeley pump, whether the booster impeller [the high pressure centrifugal additional pump] and its case * * * could be subtracted readily from the remaining parts of the pump, as Berkeley has manufactured this particular device? A. Yes, after you took the pump apart, of course it could be taken out.

"Q. And when the impeller and the impeller casing are taken out, do the motor base and the top of the discharge chamber interfit or interconnect? A. Yes, after you remove the impeller casing and shorten the shaft, you can drop that bracket that supports the motor right on down to the discharge case.

* * * * * *

"Q. And what would be the resulting characteristic of the pump with those two parts removed? A. Then it becomes a single purpose irrigation turbine pump."

As indicated above, it has never been the assertion of appellant that any of the elements combined in its pump are original. It is admitted that essentially the Berkeley pump consists of two separate pumps operated from a single motor. The first pump raises water from a deep well and creates a pool of water in the low-pressure discharge chamber. The second pump operates in its usual manner, as a high-pressure shallow-well pump, and the "shallow-well" upon which it operates is the pool of water collected at the surface in the discharge chamber. It is this combination of two pumps, arranged to operate with a single motor so as to make available simultaneously a large volume (100 to 300 gallons per minute) of low pressure (one pound per square inch) water for irrigation, and a small volume (about twenty-five gallons per minute) at high pressure (twenty pounds or more per square inch) for household use.

■ The Berkeley pump is a clever and useful design, and the original combination of the two pumps is the claimed invention. It is claimed that this pump produces a new and beneficial *result* by means of a *new mode of operation*. However, the testimony of Mr. Carpenter, President of the appellant, is clear that the only new result produced is the simultaneity of both high and low pressure pumping, for the anticipating "Advance Pump" could, without that particular attribute, pump either high or low pressure water. And the only substantial difference between the "Advance Pump" and the Berkeley pump is the substitution of turbine impellers for a jet type pump. His testimony also makes it clear that neither of the two pump elements used in the Berkeley pump operate in any different manner, nor do they accomplish any new or different result or purpose, than they did prior to their inclusion in the Berkeley pump. These two elements are used for exactly the same operation, and accomplish exactly the same purpose as they previously did. The mere *arrangement* of the two pumps in a manner similar to the "Advance Pump" arrangement, is insufficient to bring the device within the orbit of patentable invention under the A & P Tea rule we have noted.

### The Directed Verdict

■ To buttress its claims of error concerning the court's order directing the jury verdict, appellant quotes certain language from Ryan Distributing Co. v. Caley, 3 Cir., 1944, 147 F.2d 138, where at page 140 the court said: " 'a verdict will normally be directed where both the facts and inferences to be drawn therefrom, as supported by the overwhelming weight of the evidence, point so strongly in favor of one party or the other that the court feels reasonable men could not possibly come to a contrary conclusion.' "

We have no quarrel with the quoted language for it is merely a generalization of the rule applicable in run-of-the-mill cases in our federal courts. To give point to the rule it applied in the Ryan case the court further stated, 147 F.2d

at page 140, that "whatever the extent of the power in patent cases may be it is certainly as wide *upon the question of invention* as upon any other question, ordinarily treated as one of fact, but called a 'question of law' when its decision becomes the responsibility of the judge." (Emphasis supplied.)

The Ryan case was an action wherein plaintiff Ryan sought a declaratory judgment that the patent granted to Caley was invalid or not infringed. In a counterclaim Caley asserted infringement by Ryan, and demanded and received a jury trial on the issue of infringement. The trial court denied Ryan's motion for a directed verdict. The jury verdict favored Caley. Thereafter, Ryan moved to set aside this verdict and the court granted this motion and entered judgment for Ryan. Caley challenged this disposition of the case on appeal but the court of appeals affirmed the lower court. There Caley had argued that the ruling of the trial court deprives every patentee of his right to a trial by jury *on the question of invention* as guaranteed by the Seventh Amendment, citing as authority the decision in Slocum v. New York Life Insurance Co., 228 U.S. 364, 33 S.Ct. 523, 57 L.Ed. 879, a decision later qualified in Baltimore & Carolina Line v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636. Cf. footnote 2 in opinion of this court in Karn v. United States, 9 Cir., 158 F.2d 568 where the control of the court over jury verdicts was the subject of comment.

A late expression of this court dealing with the power of a trial court over a jury verdict in patent cases is found in Himes v. Chadwick, 9 Cir., 199 F.2d 100, 102, where we state that "the right and duty of the trial judge to direct a verdict in a patent case, where the circumstances indicate that the jury has departed from the relevant legal criteria by which either a jury or a judge must be guided in their or his fact-finding function, was well expressed in Packwood v. Briggs & Stratton Corp., 3 Cir., [1952], 195 F.2d 971, 973".

In the Packwood case the Third Circuit noted its prior decision in the Ryan case and referred to decisions of the Supreme Court establishing the standard of patentable invention which we must apply to the facts revealed in the instant appeal. It laid emphasis on the rule spelled out with meticulous care in A & P Tea, supra. And see Market Street Cable Railway Co. v. Rowley, 155 U.S. 621, 625, 15 S.Ct. 224, 39 L.Ed. 284; Kwikset Locks, Inc., v. Hillgren, 9 Cir., 210 F.2d 483.

In our recent opinion in Jacuzzi Bros., Inc., v. Berkeley Pump Co., 9 Cir., 191 F.2d 632, 637 we again laid down the rule respecting *the result* obtained from merely combining devices well known in the art. There we pointedly discussed the problem of patentable invention in cases where there has been incorporated in a mechanical combination old elements which were well known in the art but which did not functionally operate differently in the combination than they did before integration.

On the evidence before him and under the authorities we have cited, the trial judge acted within the scope of his authority in directing a verdict in favor of the appellee.

Judgment affirmed.