**LAYNE–NEW YORK COMPANY, INC.,**
Plaintiff,

v.

**ALLIED ASPHALT COMPANY, INC.,**
Defendant,

and

**Commonwealth of Pennsylvania,**
Intervenor.

**LAYNE–NEW YORK COMPANY. INC.,**
Plaintiff,

v.

**B. H. MOTT & SONS, INC.,**
Defendant,

and

**Commonwealth of Pennsylvania,**
Intervenor.

**Civ. A. Nos. 70–972, 70–973.**

United States District Court,
W. D. Pennsylvania.

Aug. 13, 1973.

John Webb, Pittsburgh, Pa., for plaintiff.

Raymond G. Hasley, Walter J. Blenko, Frank E. Coho, Pittsburgh, Pa., for defendants.

## OPINION

KNOX, District Judge.

This patent case involves questions of the validity and infringement by the defendants of Patent No. 3,469,405 covering a method of preventing acid mine drainage from coal mines. Pursuant to a proper demand for jury trial, the case was tried to a jury limited initially, however, to the following issues: (1) validity of the patent, (2) whether or not the patent applicant, Richard H. Reinhold, plaintiff's assignor was the sole or joint inventor and (3) whether or not the patent was rendered invalid as the result of inequitable conduct or fraud on the Patent Office by the inventor and by the plaintiff, his assignee. The issues of infringement and damages were not submitted to the initial jury but were reserved for future determination following the jury's answers with respect to the above question.

After eight days of trial, the jury rendered a special verdict (Appendix I) finding that Claim 1 of the patent was valid, Claim 7 was invalid, that the patent itself was valid, that there was no fraud on the Patent Office by the applicants but that one, John W. Foreman, an engineer, was a joint inventor.

As the result of the special verdict, the court entered judgment thereon (Appendix II) determining that Foreman was a joint inventor with Reinhold, that plaintiff Layne-New York, assignee of Reinhold, therefore did not possess full and complete title to the patent and therefore the complaints against the alleged infringers, Allied Asphalt Company, Inc. and B. H. Mott and Sons, Inc. were dismissed with prejudice. On the face of things, this judgment was mandated by Foreman's failure to join as an applicant for the patent (35 U.S.C. § 116) and his failure to join in this action as a real party in interest and indispensable party and the fact that he had assigned his interest therein, if any, to the Commonwealth of Pennsylvania. (See 35 U.S.C. § 262).[1]

No one was happy with this result and we now have before us motions for judgment NOV or in the alternative for new trial filed by all of the parties.

The Commonwealth of Pennsylvania sought to intervene as a party defendant and by order dated December 7, 1971, we allowed the intervention, 53 F.R.D. 529. The Commonwealth claims that the method of sealing off acid mine wastes employed by it in certain projects which were prosecuted by the contractors, the original defendants in this case, were not patentable, did not constitute invention and that the Commonwealth as assignee of Foreman, possesses whatever rights that Foreman may have possessed in the patents.

We conclude as did the jury that Claim 1 of the patent (to which Claims 2 through 6 were pendent) constituted an invention, that the same was not obvious or anticipated, that no fraud on the Patent Office had been committed by either Reinhold or the plaintiff herein, but that there was no evidence justifying the jury in finding that Foreman was a joint inventor.

Claim 1 of the patent reads as follows:

"A method of constructing from ground level a barrier for preventing

---

1. This result was mandated by the unquestioned rule that all co-owners of a patent must join in a suit for infringement. Rawlings v. National Mollasses Co., 394 F.2d 645 (9th Cir. 1968); Crown Die and Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24, 43 S.Ct. 254, 67 L.Ed. 516 (1923); Gibbs v. Emerson Electric Co., 29 F.Supp. 810 (W. D.Mo.1939); Turchan v. Bailey Meter Co., 19 F.R.D. 201 (D.C.Del.1956).

water from escaping an underground entry comprising:

(1) making a first row of borings from ground level into the entry and laterally across the entry;

(2) making a second row of borings from ground level into the entry and laterally across the entry, the rows being spaced from one another longitudinally in the entry;

(3) feeding and tamping sufficient mineral aggregate into each of the borings to close the entry and grouting said aggregate to form a pair of spaced support walls;

(4) drilling holes between the support walls; and

(5) filling the space between the support walls with cementitious aggregate whereby the aggregate fill and the walls will set up to form a substantially impervious water barrier in the entry."

In the court's order of December 7, 1971; allowing intervention by the Commonwealth, we stated: "Pennsylvania suffers peculiar damage by reason of a large number of abandoned coal mines whose run offs cause a great amount of pollution in the streams of the Commonwealth". Despite search and research over a long period of years, no ready solution had been found for the problem of acid mine wastes draining into the streams of Pennsylvania from these abandoned coal mines. The method described by the inventor Reinhold has enjoyed a considerable degree of success in solving this problem. We will deal with the questions in order.

## I.   Validity of the Patent.

In 35 U.S.C. § 101, it is provided:

"*Inventions   patentable.*—Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title [§ 1 et seq. of this title].   (July 19, 1952, c. 950, § 1, 66 Stat. 797.)"

■   There was ample evidence to sustain the jury's verdict that the method of sealing off acid mine wastes as described by Mr. Reinhold in this patent was a novel invention unless the exceptions described in 35 U.S.C. § 102 apply.[2]

■   While patent cases are seldom tried before juries, nevertheless since there was here a proper demand for jury trial and the evidence was submitted to a jury, we treat the verdict thereon the same as we would any other verdict as to determination of facts, *provided the standards and rules as to the validity of patents are observed.*   Therefore, the question is whether viewing

2. *"Conditions for patentability—Novelty and loss of right to patent.*—A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(c) he has abandoned the invention, or

(d) the invention was first patented or caused to be patented by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application filed more than twelve months before the filing of the application in the United States, or

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or

(f) he did not himself invent the subject matter sought to be patented, or

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it.   In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.   (July 19, 1952, c. 950, § 1, 66 Stat. 797.)"

the evidence in the light most favorable to the plaintiff, the verdict winner, there is sufficient evidence subject to the legal criteria applicable to patent cases to justify the jury's finding that there was an invention here. See Atlantic & Gulf Stevedores v. Ellerman Lines, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962); Dovberg v. Dow Chemical Co., 353 F.2d 963 (3d Cir. 1965); Neville Chemical Co. v. Union Carbide Corp., 422 F.2d 1205 (3d Cir. 1970).

■ We recognize that it is the right and duty of the trial judge to direct a verdict in a patent case where the circumstances indicate that the jury has departed from the relevant legal criteria by which either a jury or a judge must be guided in their or his fact finding function. Berkeley Pump Co. v. Jacuzzi Bros., 214 F.2d 785 (9th Cir. 1954). The same standards have been adopted by the court of appeals for our circuit with respect to jury verdicts in patent cases in Packwood v. Briggs & Stratton Corp., 195 F.2d 971 (3d Cir. 1952) where Judge Hastie said:

"A jury in a patent case is not free to treat invention as a concept broad enough to include whatever discovery or novelty may impress the jurors favorably. Over the years the courts of the United States, and particularly the Supreme Court, have found meaning implicit in the scheme and purpose of the patent laws which aids in the construction of their general language. In this process, rules and standards have been developed for use as guides to the systematic and orderly definition and application of such a conception as invention in accordance with what the courts understand to be the true meaning of the Constitution and the patent laws. Once such standards and rules are authoritatively announced any finding of 'invention' whether by a court or a jury must be consistent with them.

"This is no peculiarity of patent law. Jury findings of negligence or proximate cause must comport with common law rules devised to give reasonable and systematic meaning to those generalities. * * * And so it is throughout the body of the common law. This authority and responsibility to keep jury findings within reasoned rules and standards is an essential function of United States judges today as it long has been of common law judges. * * * It stands as a great safeguard against gross mistake or caprice in fact finding."

This view was reiterated by the court in Nachtman v. J & L Steel Corp., 235 F.2d 211 (3d Cir. 1956).

■ The court here unequivocally states, however, that its view of the evidence in this case is the same as that of the jury with respect to patentability; that under the standards and rules applicable to patents the method described in this patent constitutes a valid invention; that there was novelty in this invention; that there was no anticipated prior use; and that none of the other exceptions described in 35 U.S.C. §§ 102 and 103, were operating in this case. The question of whether Reinhold was the *sole* inventor will be discussed later.

The evidence shows that abandoned mines have been a problem which has frustrated the Commonwealth of Pennsylvania for years. Acid formed by water combining with the sulphur elements in coal in such mines has contaminated the streams of this state and constitutes a health hazard to persons making use of these waters, which are thus polluted, whether for recreation or consumption. Pennsylvania has spent considerable amounts of money and time unsuccessfully seeking a solution to this problem.

Prior to the development of the Reinhold patent, there were three methods used in attempts to stop acid mine drainage. One involved opening the mine entry of the abandoned mine, excavating back into it and putting up a dam across the entryway as a plug. Second was to drill a series of holes from the surface into the mine and put in low

slump or thick concrete to build up a dam or plug. Third was the bag method employed by the Halliburton Company which involved pumping concrete into a bag inserted into the mine through a hole drilled from the surface. The first method involved considerable cost in locating the mine entry and cutting back into the land a substantial distance to provide a flat face where a dam structure could be constructed. None of the three methods was effective because mine water when obstructed by any of these methods would usually find its way through adjacent fissures in the land and thence into a stream below.

The novelty in Reinhold's method is clearly described in his Claim 1 to which Claims 2, 3, 4, 5 and 6 are pendent. It involves initially two rows of borings made from the surface into the mine entry 20 or 30 feet apart and then filling the mine entry from each row with aggregate which is then permeated with grout (a cementitious material) so as to form two support walls across the entry. A third row of borings is then made between the other two and into this is poured a cementitious aggregate to form what is called "a plug". The combination of the two spaced bulkheads with the plug in the center forms a substantially impervious water barrier in the mine entry preventing the escape of acid mine drainage.

Defendants and the intervenor claim that this method is not new; that it was anticipated for some years prior to January 1968 when Reinhold's method was disclosed to Foreman and that the method used was obvious.

During the year 1967, the Commonwealth became interested in a project for building a new park between Butler and New Castle, Pennsylvania, known as Moraine State Park containing approximately 16,000 acres of land and a 3,225 acre lake, Lake Arthur. This would provide public facilities for boating, swimming, fishing, picnicking, ice skating, skiing, camping and nature studies. It was obviously not practical to proceed with development of the park until the problem of acid mine waste drainage into the streams in the area had been solved.

In May 1967, the Pennsylvania Department of Mines and Mineral Industries which has since become a part of the Department of Environmental Resources engaged Gwin Engineers, with which Foreman, a consulting engineer, was connected, to perform research and development relative to the elimination of acid mine drainage at Moraine State Park and to make recommendations for this purpose. During the course of this project, Gwin, through Foreman, requested assistance from Reinhold in solving the problem. Reinhold made an initial suggestion providing for only a single barrier which was rejected as unsatisfactory. Thereafter, during January 1968, he came forward with the method described in the patent for two barriers constructed through holes bored from the surface with a center plug in between likewise constructed through holes bored from the surface.

At first, Gwin was somewhat skeptical of this method and the Commonwealth was obviously hostile until the method had been constructed and proved. Plaintiff then, together with Gwin, constructed a test mine water barrier in a mine near Altoona, Pennsylvania, which was completed in July or August 1968 and proved a success.

The jury in this case was thoroughly instructed as to the requirements for issuance of a patent and the necessity of determining whether this was a real invention for which a patent should have been issued. (See Court's charge N.T. 736, et seq.) The jury was told that the law presumed the patent to be valid, that such presumption should not be overthrown except by clear and cogent evidence and that the burden of establishing the invalidity of a patent rested on the party asserting it. (See 35 U.S. C. § 282). The jury was told to consider the question of obviousness and also what constituted a valid combination

patent, whether a new and unusual result had been produced. They were also told to consider the question of anticipation by reference to prior art, i. e., "the body of information existing at the time". It was pointed out that the question to be determined was whether it was non-obvious to a person having an ordinary skill in a pertinent art, whether it was obvious to a person ordinarily skilled at a particular branch of business or work. The court was also instructed as to prior use of the invention with particular respect to the various matters that had been brought up particularly schemes for building pillars and supporting buildings. It would thus seem that all the questions of prior public use, anticipation, prior art and obviousness were brought to the jury's attention with proper instructions and considered by them.

For instance, 35 U.S.C. § 103 provides a good summary of the law in this area.[3]

In Trio Process Corp. v. L. Goldstein Sons, Inc., 461 F.2d 66 (3d Cir. 1972), the court said in defining "Prior Art" as "The existing state of knowledge in a particular art at the time an invention is made. It includes the issued patents * * *, publications, and all other knowledge deemed to be common thereto such as trade skills, trade practices, and the like."

██ ██ It is also obvious that unpublished documents or private discussions not of common knowledge do not fall within the scope of the limitations contained in 102 and hence are not prior art within the meaning of 103. Prior knowledge and use must have been accessible to the general public. Minneapolis-Honeywell Regulator Co. v. Midwestern Instruments, Inc., 298 F.2d 36 (7th Cir. 1961); Gillman v. Stern, 114 F.2d 28 (2d Cir. 1940).

██ Vague undeveloped notions, proposals and plans are not prior art. An invention is known or used when it is reduced to practice. Mere confidence that it will work is not enough. See Stearns v. Tinker & Rasor, 220 F.2d 49 (9th Cir. 1955). Under Section 102(b), an invention is not patentable if in public use or sale for one year prior to the application. Also under 102(g) we have the question whether the invention, if made by another, was abandoned, suppressed, or concealed. However, it has been held that it is deemed abandoned, suppressed or concealed if, within a reasonable time, no steps are taken to make the invention publicly known. See International Glass Co. v. United States, 408 F.2d 395 (Court of Claims 1969).

Turning to the evidence presented as to prior art, anticipated use, obviousness and whether the alleged prior invention was in public use or on sale, we find that the evidence is not convincing and is insufficient to upset the statutory presumption of validity. It is provided in 35 U.S.C. § 282: "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on the party asserting it". The jury was instructed that "when the prior art, i. e., the body of information available to inventors at the time is not considered by the Patent Office, the statutory presumption of validity ordinarily attached to the patent grant is weakened." (N.T. 737) This was taken from Chemical Construction Corp. v. J. & L. Steel Corp., 311 F.2d 367 (3d Cir. 1972).

██ When consideration is given to the alleged anticipated uses, the prior art, the matters brought to the attention of the Patent Office and reference to a similar proposal which was not used, the evidence is not convincing to upset the presumption of validity of this patent.

3. "Conditions for patentability—Non-obvious subject matter. A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. (July 10, 1952, c. 950, § 1, 66 Stat. 798.)"

The prior anticipated uses which were brought to the attention of the court and jury in this case were as follows:

(1) the California Pennsylvania State Teachers College project,

(2) the PAT Collier Township project,

(3) reference in a British Publication (Plaintiff's Ex. 11), and

(4) the Banning Mine project.

The jury was not impressed with any of these as indicating a prior anticipated use which would deny validity to this invention. The California State Teachers project and the PAT Collier Township project involved the use of bored holes to construct pillars to support buildings on the surface of the property. Neither of these projects involved the building of two barriers with a concrete plug in between so as to prevent the passage of water from a mine.

The same is to a large extent true of the British publication which involved the construction of a dam or bulkhead around an area and then filling in the holes inside so as to support a building on the surface. The British publication was called to the attention of the Patent Office, the other two were not since Reinhold the alleged inventor, thought them not similar and the jury felt the same way in its verdict.

The Banning Mine Proposal Number 4 merits more serious consideration because it did involve a construction of some sort of a barrier for the purpose of closing off water. The evidence showed that the Banning Mine ran under a river and that the purpose was to seal off the river water from the rest of the workings. This plan was worked up in 1966 and presented to satisfy a Pennsylvania State Mining Commission to determine whether the plan was safe or unsafe and whether feasible or not. The proposal involved the construction of a bulkhead with gravel grouted in from two holes in the surface in order to shut off the flow of the water. These plans and proposals were filed with the Pennsylvania Department of Mines but the barrier in question was never constructed and after plans had been drawn up for this construction, it was discovered that there was another entry or crosscut which existed which would have by-passed the water around the bulkheads which they intended to install and so the plan was abandoned. (See Reed N.T. 326).

The question therefore is whether under Section 102 Reinhold's invention as described in this patent was known or used by others in this country or whether the invention was in public use or on sale in this country more than one year prior to the date of the application in the United States. See 35 U.S.C. § 102(a) and (b). Also under 102(g) the question is whether the invention was made in this country by another who had not *abandoned,* suppressed *or* concealed it.

The statute cautions us to consider the reasonable diligence of one who has first conceived and was the last to reduce the plan to practice.

We hold and the jury so found that the Banning Mine Plan did not bar the validity of the patent in question. Under this section of the act, the device must not be inchoate, it must function and it must reach consummation. See Stamicarbon N. V. v. Escambia Chemical Corp., 430 F.2d 920 (5th Cir. 1970), where it was said:

" 'If the thing were embryotic or inchoate; if it rested in speculation or experiment; if the process pursued for its development had failed to reach the point of consummation, it cannot avail to defeat a patent founded upon a discovery or invention which was completed; while in the other case there was only progress, however near that progress may have approximated to the end view. The law requires, not conjecture, but certainty.' "

For this patent to have been barred by the Banning Mine process, it must have been shown that it was more than

a plan on paper. It must have functioned. The evidence showed clearly that it did not. For whatever reason makes no difference.

■ We therefore hold that the Reinhold patent meets the essential tests for patentability, viz: utility, novelty and non-obviousness. See Harrington Manufacturing Co., Inc. v. White, 475 F.2d 788 (5th Cir. 1973). We further hold that the Banning Mine Plans had been abandoned and were never in public use or on sale in this country. It is true that a copy of these plans was filed with the Pennsylvania Department of Mines but we do not hold that such filing of the plans would amount to description of the device in a printed publication in this or a foreign country as required by 35 U.S.C. § 102(a). Reinhold was obviously the person who first reduced this plan to practice and while the Banning Plan was disclosed to the Bureau of Mines, the plans lay there gathering dust unknown to anybody including Reinhold until the circumstances and investigation attendant upon this case brought it to light.

■ While commercial success is not necessarily proof of validity, nevertheless insofar as it is to be considered, the evidence shows that this invention by Reinhold was a successful method and was used successfully by the Commonwealth at Moraine State Park. See N.T. 482, 484, Plaintiff's Exhibit 19 and 43.

## II. *Fraud on the Patent Office.*

The jury, as noted, was asked whether there were such wilful acts including nondisclosure, concealment, false representation or other inequitable conduct in connection with the patent application as to render the patent invalid and the jury answered "No". The jury was instructed at page 743, et seq. as to inequitable conduct which would invalidate a patent and were told that such misconduct must be shown by clear and convincing proof. The jury was told that an applicant before the Patent Office stands in a confidential relationship and owes the duty of frank and truthful disclosure to the Patent Office of everything that had gone on before with respect to what he is trying to patent.

■ Reinhold did not call the attention of the Patent Office to the projects at California, Pennsylvania, or the Collier Township project which involved the construction of pillars to support a building on the surface because he did not consider them pertinent. The jury agreed with him and so does the court for reasons hereinbefore set forth. He had no knowledge of the Banning Mine Plan and cannot be faulted for not bringing this to the attention of the Patent Office. He did bring to their attention the British publication which involved a different type of construction for underpinning buildings. With respect to the Banning Mine plan, the jury was told (742) that the question they were to consider was whether Reinhold knew or should have known about this plan or what was in the record of the Department of Mines. It appears that Reinhold did disclose all relevant matters to the Patent Office.

■ Finally the defendants charge that Reinhold was guilty of inequitable conduct in not making full disclosure to the Patent Office that the engineer, Foreman, was a co-inventor of the patent. We will deal with Foreman's standing in this case in the next branch of this opinion but suffice it to say that the evidence shows that there was no basis for applicant disclosing to the Patent Office that Foreman had done the drafting work in connection with the plans for the mine barrier. Foreman himself, as will be pointed out, did not consider himself as an inventor but merely a draftsman and Reinhold so regarded him. The testimony is clear that Reinhold informed Gwin Engineers and Foreman that he was applying for a patent on this barrier but they paid no attention to this advice. They considered the device not patentable.

■ We recognize that the granting of patents must be free from fraud or

other inequitable conduct: Precision Co. v. Automotive Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); and that our own Circuit had adopted rigid standards with respect to these matters holding that concealment and disclosure may be evidence of and equivalent to a false representation because a concealment or suppression is in effect a representation that what is disclosed is a whole truth. Monsanto Co. v. Rohm and Haas Co., 456 F.2d 592 (3rd Cir. 1972). We note that in that case a finding of misrepresentation by the lower court was affirmed and that from the information submitted, the Patent Office could not make a fair appraisal of the application, particularly since the applicant failed to reveal to the Patent Office that a prior application had been rejected. The court held that an applicant seeking a patent monopoly must exercise a degree of candor and disclosure commencement with equitable standards of conduct.

We find no convincing evidence in this case that Reinhold fell short of the standards thus imposed by the Supreme Court and by our own Court of Appeals and the jury obviously came to the same conclusion.

### III. *The Question of Foreman as Co-inventor.*

The question of the effect of a finding of co-inventorship on enforcement of a patent involves an excursion into what has recently been described by Judge Newcomer in the Eastern District of Pennsylvania in Mueller Brass Co. v. Reading Industries, Inc., 352 F.Supp. 1357 (1972) as "one of the muddiest concepts in the muddy metaphysics of the patent law".

In the year 1934, our Court of Appeals in Altoona Publix Theatres v. American Tri-Ergon Corporation, 72 F. 2d 53 (CA3d 1934) had this to say about joint inventors:

"The first question arises as to what constitutes joint invention of two or more persons. The authorities are unanimous in holding that joint inventions are made when two or more persons jointly work or collaborate in devising and putting into practical form the subject-matter of the patent in question. Robinson on Patents, vol. 1, p. 567, says:

" 'It is not necessary that the same idea should occur simultaneously to each. On the contrary, it is immaterial who first conceives any particular theory or plan of the invention or in what order the development of its subordinate ideas proceeds. Where two or more inventors have agreed that a result, if it could be achieved, would be desirable, neither as yet having attempted to provide a means, and from this point go forward by mutual consultations and suggestions to devise one, the means devised becomes a joint invention. * * * In short, wherever, before the entire conception of the invention by one inventor, another meets him and by his consent unites with him in exercising inventive skill upon the development and perfecting of the conception, the product of their joint endeavor is a joint invention. * * *

" 'The same variety is possible in the exterior relations of the joint inventors, where the inventive act consists in the repeated trial of experiments. The exact part which each performs is of no consequence. Nor does it matter that one has been experimenting long in vain, nor even that he may have made some actual advance toward the discovery to which he aspires. It is enough if the experiment which finally succeeds—the one which demonstrates the practicability of accomplishing the end in view and indicates the means by which it is attainable—has been conducted under their united supervision, and in accordance with ideas and theories to which both have contributed.' "

Judge Newcomer in Mueller Brass Co., supra, discussed the matter at length:

"On the one hand, it is reasonably clear that a person who has merely

followed instructions of another in performing experiments is not a co-inventor of the object to which those experiments are directed. To claim inventorship is to claim at least some role in the final conception of that which is sought to be patented. Perhaps one need not be able to point to a specific component as one's sole idea, but one must be able to say that without his contribution to the final conception, it would have been less—less efficient, less simple, less economical, less something of benefit. This Court has found no case in which co-inventorship status was recognized where the alleged co-inventor was not deemed in some way at least presumptively, to have beneficially affected the final concept of the claimed invention, and if such a case exists, would be so anomalous as to warrant little attention.

"When an infringer claims that someone is on a patent as inventor who shouldn't be, 'this defense has always been regarded as technical, and is looked upon with disfavor by the courts (footnote omitted), and clear and convincing proof is required to sustain it'. Deller's Walker, on Patents, supra, § 42.

\* \* \* \* \* \*

"It is worth observing here that non-joinder has often been treated more harshly than misjoinder, even when raised by a third party, because of the more suspicious nature of a failure to give credit initially to one entitled to credit. Even here, however, the courts have been reluctant to strike down patents for non-joinder on challenges by third party infringers.

"In this context, we find the doctrine of 'mere suggestions' which denies co-inventorship status to a person who suggests some way to improve an invention casually but takes no further role in fitting the rough suggestion into the scheme of the invention workably. See Forgie v. Oilwell Supply Co., 58 F. 871 (3rd Cir., 1893).

"Further, we find the doctrine of employee improvement, which holds that an employee engaged in experiments to perfect another's concept does not become a co-inventor even if he suggests an improvement, unless the improvement is so significant as to amount to 'a complete invention' in and of itself. See Agawam Woolen Co. v. Jordan, 74 (Wall) U.S. 583, 19 L.Ed. 177 (1869)."

It will be noted that in the cases cited the trier of fact determined that there was a joint invention. In the instant case the triers of fact, the jury, made a similar finding and the question therefore is whether there is sufficient evidence to support such a finding. The jury in its special verdict clearly stated that Reinhold was not the sole inventor and that Foreman was the joint inventor with him. We conclude that there was insufficient evidence in the record to support the jury's verdict in this respect in answering questions 1 and 2, that these answers must be set aside and therefore the judgment entered upon the verdict must be set aside also and judgment NOV entered in favor of the plaintiff.

At no time during the pendency of this law suit did the co-inventor, Foreman, seek to intervene as a party plaintiff or state his claim to be co-inventor upon the record. Rather this defense was asserted by the alleged infringers, to wit: the contractors and the Commonwealth of Pennsylvania for whom they were working. Foreman himself at the trial said he did not consider himself a co-inventor and further that he did not consider that the invention was patentable. It was only after the verdict finding him, notwithstanding these assertions, to be a co-inventor that he executed an assignment of his interest in the patent to the Commonwealth of Pennsylvania. This assignment apparently came as an afterthought after verdict. If it was not, there is no reason apparent why any such assignment of any such interest should not have been made at the earliest moment after this suit

was brought. The evidence is further clear that Reinhold, the applicant for the patent, did nothing to conceal the patent pendency of the application from Foreman or his employer Gwin Engineering. Instead, Reinhold told them in January 1968 that he intended to apply for a patent and neither Foreman nor Gwin made any attempt to represent that either of them was a co-inventor to the Patent Office during the pendency of the patent proceedings.

Reviewing all the testimony in this case, it becomes readily apparent that there is no substantial evidence supporting the jury's finding that John W. Foreman was a co-inventor of the process described in this patent and he himself never contended that he was.

It will be borne in mind that the Gwin Engineering firm was engaged by the Commonwealth for the purpose of coming up with a solution to the problem of acid mine drainage at Moraine State Park. Mr. Foreman's testimony was that after study of the situation, they had determined late in 1967 to use a concrete plug and had considered the various methods of installing the concrete plug which were known at that time, viz: the construction of a dam by opening up the mine entries; secondly the Halliburton bag method whereby concrete is inserted into a bag through a hole drilled from the surface; and finally the use of low slump concrete. (See pages 284, 285). In any event, they had determined in late 1967 to use a concrete plug of some sort. Mr. Reinhold was then consulted as to the best method of installing such a plug. He originally came up with the idea of constructing a single bulkhead and putting grout on it as the seal and was told that this would not be satisfactory and he then returned with the idea which is the subject of the patent, viz: two barriers with a center plug in between. Mr. Foreman himself said at pages 453–454:

"It was Mr. Reinhold's initial intent to use a single bulkhead and grout the middle of it as a seal. It was my in-

sistence that this would not be satisfactory that I had a concrete center plug. This is what I wanted to install. Then he came back and said, 'Well, put another row behind it and that will hold it'. That is as simple as I can put it."

Further in his testimony (pages 455–456), Mr. Foreman clearly took himself out of the picture as a co-inventor with the following testimony:

"This morning specifically with respect to Commonwealth Exhibit 10 or 11, both of them, you stated that you considered yourself to be the designer of what is shown on those drawings. The question is do you consider yourself to be the designer of everything which you put down on paper no matter where you got the ideas for it?

"I am a little confused as to the definition of 'designer'. If you design and compile certain engineering principles, yes, I put this plan together.

"All right. Do you consider yourself the designer of the double bulkhead to contain the center plug?

"*I would consider myself the designer of the engineering details as distinguished, let's say, from the inventor. I have no claim to being the inventor.* As to designing the details for this particular double bulkhead seal, I am the designer, yes.

"You are the designer of the details as distinguished from the inventor of the engineering concept?

"Well, I am hung up a little bit here too as to the difference between the engineering concept and the inventor concept. *To invent is one thing; to design something using known principles is something else again. I take no claim to inventing anything at all,* but the compilation of existing practices and putting them together into one plan, I am the author, the compiler of let's say Commonwealth Exhibit 11, which is the final plan that we have here.

"But you take no credit for the engineering concept of a double bulkhead

seal and the double bulkhead being used as a form for a center plug?

*"If it is to mean the invention, no."*

As has been pointed out, Mr. Foreman's conduct in not making himself known as a co-inventor or claiming to be such until the trial of this case is inconsistent with any claim that he was a co-inventor. He was aware that Reinhold was applying for a patent (See N.T. 122, 436, 457) but never asserted that he was in the position of an inventor or co-inventor. While he had been thinking about building a concrete plug (N.T. 282), it is clear that this only involved a plug of some sort, not the plug which was used in the Reinhold patent.

There is no testimony in this case that Foreman did anything other than reduce the plans to final form as a draftsman and prepare the final specifications after consulting with Reinhold who was an expert on grouting (N.T. 351 and 412). The things which Foreman contributed to the plans were at most minor details which would not entitle him to consideration as a co-inventor.

It is true that the plaintiffs and Gwin Engineering participated in building a test seal in a mine in Altoona, Pennsylvania, in June 1968. While Gwin participated in the financing of this and was desirous of satisfying the Commonwealth, it is clear that the work was done by Layne-New York. (See N.T. 462, 475). This test seal in Altoona was a success and led to the Commonwealth's adopting it for use at Moraine State Park. The basic ideas which Reinhold disclosed were not changed as the result of this work. (See N.T. 65) The double seal with the concrete plug was Reinhold's idea. (N.T. 352, 353). Mr. Foreman also testified at page 454:

"Your letter of May 15, 1970, states on page 2, does it not, 'it was their suggestion' referring to Layne-New York 'to construct a row of these piers across the entry to make a bulkhead or form to contain the center plug'?

"That is the way it is stated in the letter, yes.

"And that is correct, is it not?
"Yes".

Aside from Foreman's own testimony, there is no evidence in this case which makes him out a joint inventor on the process described in the Reinhold patent. All the other evidence is consistent with what has been said before, namely, that the idea was Reinhold's and Foreman was only a draftsman.

In the light of the foregoing, it is necessary that judgment NOV be entered in favor of the plaintiffs in each of these cases as to the validity of the patent and the case will be restored to the trial list for determination of the remaining issues of infringement and damages.

We therefore will grant the motion for judgment notwithstanding the verdict in accordance with plaintiff's motion for directed verdict previously presented and denied. In accordance with Rule 50(c) we rule with respect to plaintiff's motion for new trial that it should be granted if the judgment now entered is hereafter vacated or reversed since the jury's finding that Foreman was a co-inventor is against the overwhelming weight of the evidence in this case.

ORDER

And now, to wit, August 13th, 1973, the plaintiff having moved for judgment notwithstanding the verdict in accordance with its motion for directed verdict presented at trial and not granted and the jury empaneled in these actions having returned a special verdict on December 13, 1972, pursuant to which judgment was entered on December 14, 1973, and for reasons set forth in the foregoing opinion, the court having determined that the jury's finding that Reinhold was not the sole inventor of U.S. Patent 3,469,405 and that John W. Foreman was a joint inventor with him is unsupported by the evidence but that the balance of the verdict is supported by the evidence.

It is ordered that the judgment on the verdict entered December 14, 1973, be and the same hereby is vacated and in lieu thereof,

It is ordered, adjudged and decreed as follows:

(1) John W. Foreman is not a joint inventor with Richard H. Reinhold of the subject matter of Claim 1 of Reinhold Patent 3,469,405 and, on the contrary, Richard H. Reinhold was the sole inventor of the said subject matter.

(2) Plaintiffs possess full and complete title in and to Reinhold Patent 3,469,405 and have capacity to bring and maintain these actions.

(3) Claim 1 of Patent 3,469,405 (to which are pendent claims 2, 3, 4, 5 and 6) of which Richard H. Reinhold was the inventor is hereby determined to be a valid patent.

(4) Neither Richard H. Reinhold nor plaintiff were guilty of any fraud or inequitable conduct in connection with the patent application which would invalidate it.

(5) Claim 7 of Patent 3,469,405 is determined to be invalid.

(6) Counterclaims of Allied Asphalt Company, Inc. and B. H. Mott & Sons, Inc. against the plaintiff are dismissed with prejudice.

(7) The case is ordered restored to the trial list of the undersigned for the purpose of determining the issues of infringement and damages against the defendant Allied Asphalt Company, Inc., in 70–972 and B. H. Mott and Sons, Inc. in 70–973 and the Commonwealth of Pennsylvania as intervening defendant in both cases.

(8) The motions of the defendants and the intervenor, the Commonwealth of Pennsylvania, for judgment notwithstanding the verdict or alternatively for a new trial are denied.

## APPENDIX I

### SPECIAL VERDICT

In accordance with instructions of the court, the jury hereby finds as follows:

(1) Did Mr. Reinhold conceive the subject matter of U.S. Patent No. 3,469,405 solely?

ANSWER: No
"yes" or "no"

(2) If your answer to the first question is "no", whom do you find to be the joint inventor with him?

ANSWER: John W. Foreman

(3) Did Mr. Reinhold and/or Layne-New York engage in such willful acts including non-disclosure, concealment, false representation or other inequitable conduct in connection with the application to the Patent Office as to render the patent invalid?

ANSWER: No
"yes" or "no"

(4) Under the instructions of the court, do you find Patent No. 3,469,405, of which Richard Reinhold claims to be the inventor, a valid patent?

ANSWER: Yes
"Yes" or "no"

(5) Do you find Claim 1 of the patent to be valid or invalid?

ANSWER: Valid
"valid" or "invalid"

(6) Do you find Claim 7 of the patent to be valid or invalid?

ANSWER: Invalid
"valid" or "invalid"

(Do not for this purpose consider Claims 1 through 6.)

Dec. 13, 1972

/s/ Sylvester L. Zurgirt Foreman
/s/ Robt. C. Ransick
/s/ James C. Hill
/s/ Elmer J. Lang
/s/ Mercedes Mack
/s/ William B. O'Toole
/s/ George K. Wright
/s/ Carmella R. Mason

## APPENDIX II

### JUDGMENT ON VERDICT

AND NOW, to wit, December 14, 1972, a jury empanelled in these actions hav-

ing returned a Special Verdict on December 13, 1972,

IT IS ORDERED, ADJUDGED AND DECREED as follows:

(1) John W. Foreman is a joint inventor with Richard H. Reinhold of the subject matter of Claim 1 of Reinhold Patent 3,469,405.

(2) Plaintiff does not possess full and complete title in and to Reinhold Patent 3,469,405 and lacks capacity to bring and maintain these actions.

(3) The complaints herein against Allied Asphalt Company, Inc. and B. H. Mott & Sons, Inc. are dismissed with prejudice.

(4) The counterclaim of Allied Asphalt Company, Inc. and B. H. Mott & Sons, Inc. against plaintiff are dismissed with prejudice.

(5) The counterclaims of plaintiff against the Commonwealth of Pennsylvania are dismissed with prejudice.

The foregoing form of judgment is hereby approved and the Clerk is directed to enter the same pursuant to Rule 58

/s/ William W. Knox
United States District Judge